UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FREE LANCE-STAR PUBLISHING CO. | ) | |
| OF FREDERICKSBURG, VA[1] | ) | Case No. 14-30315-KRH |
| | ) | |
| | ) | |
| Debtor. | ) | |

**MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER
PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363, 365, 506,
507(a), 553, 1107(a), 1108, AND 1129(b) AND BANKRUPTCY RULE 6003
AUTHORIZING CONTINUATION OF CERTAIN CUSTOMER PRACTICES**

The debtor in possession in the above-captioned case (the "Debtor") hereby moves (the "Motion") this Court for entry of an order (in the form of Exhibit A attached hereto), pursuant to sections 105(a), 363, 365, 506, 507(a)(7), 553, 1107(a), 1108, and 1129(b)(2) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing, but not directing, the Debtor to continue prepetition customer practices and programs that the Debtor deems necessary and in the best interests of its estate, creditors, and interest holders. In support of the Motion, the Debtor respectfully represents:

**JURISDICTION AND VENUE**

1.      On or about January 23, 2014 (the "Petition Date"), the Debtor commenced its reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy

---

[1] The Debtor's address and TIN are as follows: 616 Amelia Street, Fredericksburg, VA 22401; 54-0216580.

Lynn L. Tavenner, Esquire (Va. Bar No. 30083)
Paula S. Beran, Esquire (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy: (804) 783-0178

*Proposed Counsel for the Debtor*

Code.

2.      The Debtor is continuing in possession of its properties and is operating and

managing its business, as a Debtor-in-Possession, pursuant to §§ 1107 and 1108 of the

Bankruptcy Code.

3.      The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### THE DEBTOR'S BUSINESS AND BACKGROUND

4.      The Free Lance-Star Publishing Co. of Fredericksburg, Va. ("FLS" or "the

Company") is a family-owned publishing, newspaper, radio and communications company

located primarily in Fredericksburg, Virginia.  William Douglas Properties, L.L.C. ("William

Douglas") is a related entity that owns a portion of the land pursuant to which FLS operates

certain aspects of its business.

5.      For nearly 130 years, FLS has developed a reputation for integrity, credibility and

innovation in the Fredericksburg region and the media industry.  The Free Lance was first

published in 1885 when a group of local Fredericksburg merchants and businessmen created the

paper to serve the news and advertising needs of the community. In 1900, the company merged

with The Daily Star and published two papers independently until 1926 when, under the

leadership of Josiah P. Rowe Jr., they were combined into a single, six day a week newspaper:

The Free Lance-Star. Rowe eventually became the owner and publisher of the newspaper.

6.      The sons of Josiah P. Rowe, Jr., Charles S. Rowe and Josiah P. Rowe III, assumed

the duties of co-publishers after their father's death in 1949. In 1997, upon Charles' retirement,

the family of Josiah P. Rowe III purchased total ownership of the business. Florence C. Barnick

and Nicholas J. Cadwallender, Associate Publishers (and Rowe family members), served as the

Company's leadership with Josiah P. Rowe III as President and Publisher.  In 1998, The Free

Lance-Star responded to changing lifestyles and regional growth by adding a Sunday edition and

moving from afternoon to morning publication.

7.      The Company diversified by expanding into radio broadcasting.  WFLS-AM, the
Company's first radio station, began on-air operation in 1960, WFLS-FM in 1961, and today
WFLS-FM's country format is the region's radio powerhouse. The AM signal now broadcasts
WNTX News, Talk, Sports. In 1994, WYSK (now WVBX) became the Company's second FM
station. Situated in Spotsylvania County, its contemporary hits format is popular among younger
listeners. To round out radio offerings, the Company purchased WWUZ Classic Rock, licensed
to Bowling Green, in 2001.  All four stations continue on the air today.

8.      As the Company has grown to meet business and audience demand, its mission
remained: to improve and connect the lives of the people in the communities it serves.   Indeed,
as the internet emerged in the mid-1990's, the Company developed a web presence under the
name *FLStarWeb.com*. In 1999, the web address was changed to [www.fredericksburg.com](www.fredericksburg.com), and
it has become the premier news, advertising and community portal for the region.

9.      In 2006, the Company developed plans to diversify the portfolio of offered
services by significant expansion of the commercial printing business.  Branch Banking and
Trust ("BB&T") pursued the Company to be chosen as the lender and, in 2007, the Company
borrowed $50.8 million from BB&T.  The Company designed and built a state-of-the-art printing
facility that began operation in 2009. The building of the plant coincided with the worst
recession since the Great Depression.  Newspaper and radio advertising declined precipitously as
businesses reduced their marketing budgets. Additionally, newspaper circulation revenue
declined as many readers migrated to the internet for their news.

10.      As early as 2009, with Print Innovators still under construction, it became
apparent the Company would not be in compliance with certain covenants of its loan agreement
with BB&T and gave notice to BB&T of that fact.  In December of 2011, the Company signed a
forbearance agreement with BB&T.  In 2011 Josiah P. Rowe III retired after 60 years as

publisher, and Nicholas J. Cadwallender became President and Publisher, with Florence C. Barnick serving as Associate Publisher. The Company continued to make timely payments to BB&T even though revenue continued to decline.  Efforts to restructure the business to become compliant with the loan covenants could not fully offset the continued revenue losses. These efforts included reducing employee head count by one third from 454 full and part-time employees in 2007 to 303 full and part-time employees at the end of 2013.

11.     At BB&T's request, the Company, with the assistance of professional advisors, attempted to refinance the BB&T obligations.  When this was not successful, the Company, also with the assistance of professional advisors, pursued a sale as a going concern.  However, the Company and its advisors were not able to find a buyer at a price acceptable to BB&T.  In late June of 2013 BB&T, with permission of the Company, sold its loan to DSP Acquisitions, LLC, a company operated by Sandton Capital Partners (collectively, "Sandton").

12.     Sandton  informed the Company that it wanted the Company to file a Chapter 11 bankruptcy case and sell substantially all of its assets pursuant to 11 U.S.C. § 363.  Sandton also indicated that it desired to be the entity that obtained the Company's assets and, if it did obtain possession of the Company's assets, it would continue the Company's businesses.

13.     With no better option available, the Company agreed to work with Sandton in connection with a Chapter 11 filing in an effort to maximize the value of its assets and in the hopes of providing a mechanism for the continuation of the Company's businesses and mission, which have developed over the past 129 years.

14.     Unfortunately, there remain material disagreements on the implication of certain facts.  Consequently, the parties have been unable to agree on (i) Sandton's adequate protection and (ii) the appropriate impact of those facts in relation to a sale transaction.

**RELIEF REQUESTED**

15.     By this Motion, the Debtor seeks entry of an order authorizing, but not directing,

the Debtor (a) to receive, process, and honor credit card transactions in the ordinary course of business; (b) to honor all obligations related to newspaper subscriptions; (c) to honor all obligations related to paid contracts of customers; (d) to honor all obligations related to sales at retail locations; (e) to honor lease agreements to customers who prepay monthly for space on the Debtor's radio towers; (f) to honor radio and newspaper customer promotions; (g) to provide Advertising Refunds (as defined herein) to customers; (h) to perform and honor the Debtor's prepetition obligations related to its Customer Programs (as defined herein) in the ordinary course of business; and (i) to honor all such other similar policies, programs and practices of the Debtor (collectively, the "Customer Programs") in the ordinary course of business.

16.    The Debtor further requests that all banks and other financial institutions on which checks of its customers are drawn be authorized and directed to receive, process, honor, and pay any and all such checks, whether presented before or after the Petition Date, upon receipt by each such bank of notice of such authorization.

## **BASIS FOR RELIEF**

17.    Prior to the Petition Date, in the ordinary course of its business, the Debtor provided its customers with certain benefits in the form of the Customer Programs and, as a result thereof, received payments from its customers that customers had not yet received the benefit of the bargain (collectively, the "Customer Obligations").

18.    In addition, customers hold contingent pre-bankruptcy claims against the Debtor for refunds, returns, exchanges, and other credit balances (collectively, the "Refunds") relating to goods sold or services rendered to customers in the ordinary course of business before the Petition Date (collectively, the "Customer Claims").

19.    The success and viability of the Debtor's business, and ultimately the Debtor's ability to maximize the value of its assets and to successfully reorganize, are totally dependent upon the patronage and loyalty of its customers.  In this regard, the Debtor's Customer Programs

are critical, and any delay in honoring the Debtor's obligations thereunder will severely and irreparably impair customer relations. Any failure to honor prepetition obligations, for even a brief time, may well drive away valuable customers, thereby harming the Debtor's efforts to reorganize.

20.    Accordingly, the Debtor seeks authority, but not direction, to continue the Customer Programs, including authority to honor prepetition claims arising therefrom, in its sole discretion. A summary of the significant Customer Programs follows.

## A.    CREDIT CARD PROCESSING AGREEMENTS

21.    The Debtor is a party to certain agreements with credit card companies and processors pursuant to which the Debtor is able to accept credit card payments, subject to certain adjustments, returns, promotional fees and refunds.

22.    The Debtor is party to an agreement, as modified, with Branch Banking & Trust Corporation ("BB&T"), which governs the processing and settlement of VISA, MasterCard, Discover Card, and American Express transactions. In addition, the Debtor is party to an agreement, as modified, with Braintree Payment Solutions, LLC ("Braintree") related to various software system for customers to remit online payments and processing of recurring monthly payments (collectively, BB&T and Braintree are the "Credit Card Providers").

23.    Credit card fees (the "Credit Card Fees") are charged by the Credit Card Providers average approximately $15,300 per month or $184,000 annually. The Credit Card Fees' rates range from 1% – 3% and it's estimated that $11,000will be debited from the Debtor's credit card proceeds in the post-petition period for pre-petition credit card charges. BB&T's processor generally debits the Debtor's credit card account, in an amount not to exceed $6K, on or around the second business day of the month for the prior month's activity.[2] Braintree's processor generally debits the Debtor's account in an amount not to exceed $14,000 on or around

---

[2] Includes the interchange fees charged by the card-issuing banks.

the 15th of the month for fees relating to the prior month.  There are usually 0-3 credit card

chargebacks per month, averaging approximately $250 per month or $3,000 annually.

24.    Under the terms of its agreements, the Debtor is required to pay the Credit Card

Providers fees for their services, certain amounts of which may have accrued but remain unpaid

as of the Petition Date.

25.    The Debtor requests that it be authorized, but not directed, to continue to pay

these fees in the ordinary course of business, including, but not limited to, amounts related to

promotional fees, returns and exchanges, regardless of whether they arose pre- or postpetition, in

order to avoid interruption of these vital credit card processing services and programs.  Nothing

in this request should be construed to be the assumption of an executory contract under section

363 of the Bankruptcy Code.

## B.    MONTHLY NEWSPAPER SUBSCRIPTIONS

26.    The Debtor offers three subscription plans to subscribers.  Subscription plans

include: (i) $17 per month – full digital access plus Home Delivery 7 days a week; (ii) $12 per

month – full digital access (tablet site) 7 days a week plus weekend home delivery; and (iii) $15

per month – full digital access (tablet site) 7 days a week.  All plans offer monthly payment

option (one-time or recurring) or one-time non-recurring payment for 12-week, 24-week or 52-

week period.  Approximately 50% of subscribers pay by credit card and if customer selects

monthly recurring payment option, customer's credit cards is charged automatically in advance

of billing cycle until cancelled.  The other 50% of subscribers pay by cash or check.  In the

ordinary course of business, customers cancel subscriptions and are refunded the remaining

prepaid but unused portion.  The refund amount is di minimus for each individual customer and

the company estimates that at a maximum of $2,000 in refunds is due at any time to fewer than

100 customers.  These customers often restart their subscriptions at a later date. Accordingly, the

refunds are an important accommodation in keeping the customers long-term.  Not refunding the

customers would be detrimental from both public relations and continuation of sales /

subscriptions stand-points.

27.     Accordingly, the Debtor requests that it be authorized, but not directed, to deliver

newspapers and other publications to subscribers who have paid in advance for delivered product

and to refund customers who cancel their subscriptions after they have prepaid in the ordinary

course of business.  Nothing in this request should be construed to be the assumption of an

executory contract under section 363 of the Bankruptcy Code.

## C.     PAID CONTRACTS

28.     The Debtor has certain transient accounts that includes classified ads, event

announcements (e.g., wedding and other social), personals and dating service, obituaries, etc.

(collectively, the "Transient Accounts").  The majority of customers for the Transient Accounts

(approximately 80%), including all individuals placing ads, must prepay.  The balance as of

12/31/13 was $7,652.,000;  The Debtor has customer credits outstanding for customers who

either: (i) overpaid for ads; or (ii) ran ad for periods shorter than what they paid.  Total unapplied

customer balance as of 12/31/13 was $29,839.  Continuation of the Transient Accounts and

honoring overpayments/refunds is vital to the Debtor's ongoing relationship with its customers

and it provides significant benefit to the Debtor.

29.     Accordingly, the Debtor requests that it be authorized, but not directed, to

continue to (i) run ads and other paid content for customers who prepaid and (ii) provide credits

or refunds to customers who have overpaid for ads and paid content.

## D.     RETAIL LOCATIONS

30.     Prior to the Petition Date, the Debtor delivered newspapers to approximately 322

retail locations for resale.  Retail locations are invoiced either weekly or every two weeks.  The

Debtor collects excess newspapers that the retailers did not sell and credits their next invoices.

Approximately 33% of Monday through Saturday retail deliveries are returned for a credit and

approximately 25% of Monday through Saturday retail deliveries are returned for a credit.

31.     The Debtor requests authority, but not direction, to continue its practices related to the retail locations regardless of whether certain of the Transactions occurred before the Petition Date.

### E.     RADIO TOWER PREPAID LEASES

32.     The Debtor leases tower space on its radio towers to 7 customers.  Many of these customers pay in advance.  Unearned radio income (the "Unearned Radio Income") was $61,600 as of December 31, 2013.

33.     The Debtor requests that it be authorized, but not directed, to honor lease agreements to customers who prepay monthly and to provide the services related to the Unearned Radio Income.

### F.     RADIO AND NEWSPAPER PROMOTIONS

34.     The Debtor, in the context of its radio and newspaper operations, runs customer promotions in the ordinary course of business.  For example, a radio station may award a prize to the 10th caller who answers a question correctly, and award concert tickets.  The Debtor also engages in joint promotions with area businesses.  It is estimated that open promotion obligations to customers and listeners does not exceed $2,500 on the Petition Date.

35.     Accordingly, the Debtor requests that it be authorized, but not directed, to (i) award prizes that contestants have won before the Petition Date but not yet collected as of the Petition Date and ii) honor ongoing promotions.

### G.     ADVERTISING REFUNDS

36.     The Debtor allows refunds (the "Advertising Refunds") to its advertisers relating to customer overpayments and to the Debtor not fulfilling its customer obligations – i.e., running the wrong ad, wrong size, wrong timing, etc.  The Debtor provides a credit on the next month's invoice.  To the extent the customer does not place advertising in the following month, the

Debtor refunds the unused balance. The Debtor estimates that at any given time less than 400 refunds/credits are due to customers and the total outstanding does not exceed $100,000.

37. The ability to continue to provide the Advertising Refunds to customers is vital to the Debtor's ongoing relationship with the Debtor's customers. The Debtor has concluded that, without the ability to provide the Advertising Refunds, many customers would be unwilling to purchase future advertising from the Debtor. Accordingly, the Debtor seeks entry of an order authorizing, but not directing, the Debtor to continue to provide Advertising Refunds and pay Customer Claims associated therewith in the ordinary course of business, including those relating to sales occurring before the Petition Date.

## H.   FREE LANCE-STAR COMMUNITY PROGRAMS

38. The Debtor participates in community related programs in the form of barter and sponsorship agreements as summarized on Exhibit B attached hereto (the "Community Programs").

39. The ability to continue the Community Programs is important to the Debtor's ongoing relationship with its customers and reputation within the Community – a reputation that generates sales for the Debtor's benefit. Accordingly, the Debtor seeks entry of an order authorizing, but not directing, it to continue the Community Programs.

## APPLICABLE AUTHORITY

## I.   BANKRUPTCY CODE SECTION 507(a)(7) AUTHORIZES THE HONORING OF THE CUSTOMER CLAIMS AND OBLIGATIONS.

40. At least a portion of the obligations of the Debtor to its customers is likely entitled to priority treatment pursuant to Bankruptcy Code section 507(a)(7), which grants a seventh-level priority to allowed unsecured claims of individuals, to the extent of $2,775.00 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the

personal, family, or household use of such individuals, that were not delivered or provided.  11
U.S.C. § 507(a)(7).   Money collected prepetition by the Debtor pursuant to the Customer
Programs falls within this priority category.

41.    For example, the purchase of a prepaid classified ad represents a "deposit . . . of
money in connection with the purchase . . . of property, or the purchase of services, for the
personal, family, or household use of such individual."  Furthermore, unless this Motion is
granted, such "deposits" will represent payment for goods or services "that were not delivered or
provided."  Thus, the Debtor's customers who participated in the Customer Programs described
above will likely be entitled to receive payment in full before payment of claims of general
unsecured creditors.

## II.    HONORING CUSTOMER CLAIMS AND OBLIGATIONS IS APPROPRIATE UNDER BANKRUPTCY CODE SECTIONS 506, 553, AND 1129(b)(2).

42.    The Debtor believes that the certain of its customers who participate in the
Customer Programs have outstanding accounts receivable owed to the Debtor as of the Petition
Date.  In the event that the Debtor failed to honor the valid Customer Obligations, the Debtor
concludes that these customers likely would assert their right to offset any amounts owed to them
by the Debtor under the Customer Programs against any receivables that such customers owed to
the Debtor.

43.    To the extent that both of such obligations arose before the Petition Date,
Bankruptcy Code section 553 provides that the Bankruptcy Code has no effect on such setoff
rights.  See 11 U.S.C. § 553.  Furthermore, Bankruptcy Code section 506 provides that
customers with such setoff rights would be considered secured creditors.  See id. 11 U.S.C.
§ 506. Thus, pursuant to Bankruptcy Code section 1129(b)(2), payment to such customers
would be required under any plan of reorganization prior to any payment to the Debtor's
unsecured creditors.  See, e.g., 11 U.S.C. § 1129(b)(2)(B)(ii).  Such payment does not, therefore,

prejudice the Debtor's unsecured creditors.

44.     Even if the customers cannot exercise rights of setoff, the Debtor concludes that certain of its customers may recover their Customer Claims through recoupment, which occurs when the debts owed by the Customer and by the Debtor must "arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." In re Univ. Med. Ctr., 973 F.2d 1065, 1081 (3d Cir. 1992); see also In re Camellia Food Stores, Inc., 287 B.R. 52, 61 (Bankr. E.D. Va. 2002) (applying the Third Circuit's "integrated transaction" test as set out in In re Univ. Med. Ctr. and noting that the Fourth Circuit has implicitly endorsed this test).

45.     Because customers that might not be able to assert setoff rights may be entitled to recover their funds through recoupment, such customers would be in the same position as those customers with setoff rights, i.e., entitled to payment in full.  Moreover, the automatic stay of Bankruptcy Code section 362 would not prevent such customers from exercising their valid recoupment defenses.  See In re Univ. Med. Ctr., 973 F.2d at 1080.  Thus, the payment of such Customers' Claims would likewise be required under any plan of reorganization and would not prejudice the Debtor's unsecured creditors.

46.     In the event that the Customer Claims are not paid and the customers resort to asserting setoff rights or recoupment defenses, the Debtor would be required to expend time, expenses, and resources either responding to such customers' lift stay requests in order to assert setoff rights or otherwise challenging, to the extent appropriate, any invalid recoupment defense asserted by the customers.  The Debtor concludes that it would thereby incur added and unnecessary administrative expenses in addition to the ill will of its customers, both to the detriment of the Debtor's creditors and other parties in interest.

47.     In contrast, payment of valid Customer Obligations and maintenance of the Customer Programs as set forth herein, will (i) provide the Debtor with a means of efficiently

processing the Customer Claims and (ii) reduce the administrative expenses the Debtor would

otherwise face if compelled to challenge any customers' exercise of purported setoff rights or

recoupment defenses.  In addition, as noted above, such payment will allow the Debtor to

maintain positive relations with its customers.

48.      Accordingly, the payment contemplated hereby will not diminish the assets of the

Debtor's estate to the detriment of unsecured creditors.  Moreover, such payment is consistent

with the priority of payment of claims under the Bankruptcy Code.

## III.    HONORING CUSTOMER CLAIMS AND OBLIGATIONS AND COMMUNITY PROGRAMS IS APPROPRIATE UNDER BANKRUPTCY CODE SECTION 363.

49.      Under Bankruptcy Code section 363, a bankruptcy court is empowered to

authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the

ordinary course of business.  See 11 U.S.C. § 363.  In order to obtain approval for the use of

estate assets outside the ordinary course of business, the debtor must articulate a valid business

justification for the requested use.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr.

S.D.N.Y. 1985).  The preservation and protection of a debtor's business, the retention of a

debtor's customer base and the maintenance of customer loyalty provide a sufficient business

justification for (a) payment of the Customer Obligations and (b) continuation of Community

Programs, even if such were deemed to be outside the ordinary course of business.  See id. at

175.

50.      Accordingly, this Court should grant the requested relief under Bankruptcy Code

section 363.

## IV.    HONORING CUSTOMER CLAIMS AND OBLIGATIONS AND MAINTAINING THE CUSTOMER AND COMMUNITY PROGRAMS IS APPROPRIATE UNDER BANKRUPTCY CODE SECTIONS 1107(A) AND 1108.

51.      The Debtor, operating its business as a debtor in possession under Bankruptcy

Code sections 1107(a) and 1108, is a fiduciary "holding the bankruptcy estate and operating the

business for the benefit of [its] creditors and (if the value justifies) equity owners." In re CoServ,

L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor

in possession is the duty "to protect and preserve the estate, including an operating business's

going-concern value." Id.

52.     Courts have noted that there are instances in which a debtor in possession can

fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.  The

CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

enhancement of the estate." Id. at 498.  The court provided a three-pronged test for determining

whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's

fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.
> Second, unless it deals with the claimant, the debtor risks the
> probability of harm, or, alternatively, loss of economic advantage
> to the estate or the debtor's going concern value, which is
> disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor
> can deal with the claimant other than by payment of the claim.

Id. at 498.

53.     Honoring the Customer Obligations and maintaining the Customer and

Community Programs meet each element of the CoServ court's standard.  First, as described

above, the success and ultimate viability of the Debtor's business is dependent upon customer

loyalty.  In the Debtor's business judgment, the uninterrupted maintenance of its Customer and

Community Programs is essential to maintaining such loyalty.

54.     Second, the disruption and adverse publicity that would necessarily result from

the failure to meet Customer Obligations or from discontinuing the Customer and Community

Programs would threaten the Debtor's customer base and ultimately, its ability to successfully

reorganize, thereby causing harm to the Debtor that is grossly disproportionate to the cost of the

Customer Obligations and Customer and/or Community Programs.

55.     Third, the Debtor has examined other options short of payment of the Customer

Obligations and continuation of the Customer and Community Programs and has determined that

to avoid significant disruption of the Debtor's business operations there exists no practical or

legal alternative to payment of such obligations.

56.     Therefore, the Debtor can meet its fiduciary duties as a debtor in possession under

Bankruptcy Code sections 1107(a) and 1108 only by maintaining the Customer and Community

Programs and by honoring legitimate Customer Obligations.

## V.     BANKRUPTCY CODE SECTION 105 AND THE DOCTRINE OF NECESSITY SUPPORT PAYMENT OF THE CUSTOMER CLAIMS AND OBLIGATIONS AND MAINTENANCE OF THE CUSTOMER PROGRAMS.

57.     Payment of the valid Customer Obligations and the continuation of the Customer

and Community Programs in the ordinary course may also be authorized under Bankruptcy Code

section 105(a) and the "doctrine of necessity."

58.     Under Bankruptcy Code section 105, this Court "may issue any order . . . that is

necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C.

§ 105(a).  For the reasons set forth above, and in light of the need for the Debtor to preserve the

going concern value of its business through, among other things, the maintenance of the

Customer and Community Programs, the relief requested herein is proper and should be granted.

59.     The continuation of the Customer and Community Programs is further supported

by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a

bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the

reorganization process where the payment of such claims is necessary to the reorganization.  See

In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan

payment of a pre-petition obligation when essential to the continued operation of the debtor[,]"

and must show a "substantial necessity."); see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D.

15

Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment).

60.     The doctrine of necessity is a widely accepted component of bankruptcy jurisprudence.  See In re NVR L.P., 147 B.R. at 127 ("[T]he 'necessity of payment' rule is a narrow exception well-established in bankruptcy common law."); Just For Feet, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season).

61.     Courts in this District and elsewhere have determined that credit card processing agreements are executory contracts pursuant to 11 U.S.C. § 365.  See In re Best Products Co., 210 B.R. 714, 718 (Bankr. E.D. Va. 1997) (requiring counterparty to continue performing under private label credit card agreement, which was held to be an executory contract and not a financial accommodation under § 365(c)(2) and (e)(2)(B)); see also In re Boscov's Inc., 2008 Bankr. LEXIS 3125 at * 2 (Bankr. D. Del. Nov. 21, 2008) (finding that private label credit card and credit card processing agreements are executory contracts).  Because credit card processing agreements are executory contracts, the Credit Card Providers are prohibited from attempting to collect balances from the Debtor for amounts owed under their respective agreements.  However, the Credit Card Providers may attempt to reduce their exposure by attempting to collect outstanding balances directly from the Debtor's existing customers, which potentially threatens the Debtor's relationship with its customers.

62.     Because retaining the loyalty of customers is critical to successful chapter 11 cases, courts in this District and elsewhere have authorized debtors to honor certain prepetition obligations to customers and to continue customer programs.  See, e.g., In re AMF Bowling Worldwide, Inc., No. 12-36495 (Bankr. E.D. Va. November 13, 2012) (Huennekens, J.); In re S & K Famous Brands, Inc., No. 09-30805 (Bankr. E.D. Va. February 9, 2009) (Huennekens, J.);

In re Circuit City Stores, Inc., et al., Case No. 08-35653 (KRH) (Bankr. E. D. Va. Nov. 12, 2008); In re Movie Gallery, Inc., Case No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 18, 2007); In re the Rowe Cos., Case No. 06-11142 (SSM) (Bankr. E.D. Va. Sep. 20, 2006); In re US Airways, Inc., Case No. 04-13819 (SSM) (Bankr. E.D. Va. Sep. 14, 2004); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. Jun. 12, 2007).

63.     For the reasons discussed herein, it is evident that maintenance of the Customer Programs, including payment of any prepetition Customer Obligations and Customer Claims associated therewith, is necessary to preserve the Debtor's going-concern value.  In particular, absent continuation of the Customer and Community Programs, the Debtor's business and operations will be detrimentally impacted due to the resulting injury to the Debtor's reputation and loss of consumer loyalty during a critical time for the Debtor and its business.  Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

## VI.     PAYMENT OF THE CUSTOMER CLAIMS AND OBLIGATIONS IS WARRANTED UNDER BANKRUPTCY RULE 6003.

64.     Similarly, the relief requested is warranted under Bankruptcy Rule 6003, which provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001.

Fed. R. Bankr. P. 6003.

65.     No court within the Fourth Circuit has interpreted the "immediate and irreparable harm" language in the context of Bankruptcy Rule 6003 in any reported decision.[3]  However, the

---

[3]  Although there is not direct authority concerning Bankruptcy Rule 6003 in the Fourth Circuit, at least one bankruptcy court, applying Bankruptcy Rule 6003, concluded that first-day relief in a similar context was warranted because such relief was necessary to avoid irreparable harm.  See In re First NLC Fin. Servs., LLC, 382 B.R. 547,

Fourth Circuit Court of Appeals has interpreted the same language in the context of preliminary

injunctions.  In that context, irreparable harm has been interpreted as a continuing harm that

cannot be adequately redressed by final relief on the merits and for which money damages

cannot provide adequate compensation.  See, e.g., Hughes Network Systems, Inc. v. Interdigital

Communications Corp., 17 F.3d 691, 694 (4th Cir. 1994).  Further, the harm must be shown to

be actual and imminent, not speculative or unsubstantiated.  See, e.g., Scotts Co. v. United

Industries Corp., 315 F.3d 264, 283 (4th Cir. 2002) (citing Direx Israel, Ltd. v. Breakthrough

Medical Corp., 952 F.2d 802, 812 (4th Cir. 1991)).

66.     The Customer and Community Programs sustain the Debtor's positive reputation

in the marketplace, ensure customer loyalty and satisfaction, and prevent the driving away of

valuable customers that would result if the Debtor did not honor its obligations to its customers.

Therefore, to the extent that the requirements of Bankruptcy Rule 6003 are applicable to the

relief requested in the Motion, the Debtor submits that for the reasons already set forth herein,

the relief requested in this Motion is necessary to avoid immediate and irreparable harm as

defined by the Fourth Circuit Court of Appeals.

67.     Accordingly, the Court should allow the continuation of the Customer and

Community Programs and payment of valid Customer Obligations.

68.     Because retaining the loyalty of customers is critical to successful chapter 11

cases, courts in this District and elsewhere have authorized debtors to honor certain prepetition

obligations to customers and to continue customer programs.  See, e.g., In re AMF Bowling

Worldwide, Inc., No. 12-36495 (Bankr. E.D. Va. November 13, 2012) (Huennekens, J.); In re S

& K Famous Brands, Inc., No. 09-30805 (Bankr. E.D. Va. February 9, 2009) (Huennekens, J.);

In re Circuit City Stores, Inc., et al., Case No. 08-35653 (KRH) (Bankr. E. D. Va. Nov. 12,

---

549-50 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid
irreparable harm).

2008); <u>In re Movie Gallery, Inc.</u>, Case No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 18, 2007); <u>In re the Rowe Cos.</u>, Case No. 06-11142 (SSM) (Bankr. E.D. Va. Sep. 20, 2006); <u>In re US Airways, Inc.</u>, Case No. 04-13819 (SSM) (Bankr. E.D. Va. Sep. 14, 2004).

69.    Nothing herein shall be deemed an assumption or adoption of any policy, program, practice, contract or agreement or shall otherwise affect the Debtor's rights under Bankruptcy Code section 365 to assume or reject any executory contract or unexpired lease.

70.    The Debtor does not at this time request authorization to assume as executory contracts any prepetition obligations to customers.  Rather, the Debtor simply requests authorization to continue the Customer and Community Programs and satisfy Customer Obligations, as the Debtor concludes, in the exercise of its business judgment, are necessary and in its best interests and in the best interests of its estate, creditors and interest holders.

## NOTICE

71.    Notice of this Motion will be given to: (i) the Office of the United States Trustee for the Eastern District of Virginia; (ii) counsel to the Debtor's prepetition secured lenders; and (iii) the Debtor's top twenty (20) largest unsecured creditors.  The Debtor submits that, under the circumstances, no other or further notice of the Motion is required.

## WAIVER OF MEMORANDUM OF LAW

72.    Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Debtor requests that the requirement that all motions be accompanied by a separate memorandum of law be waived.

## NO PRIOR REQUEST

73.    No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order,

substantially in the form attached hereto, granting the relief requested in the Motion and such

other and further relief as may be just and proper.

THE FREE LANCE-STAR PUBLISHING CO.
OF FREDERICKSBURG, VA


By:   */s/ Paula S. Beran*
        Proposed Counsel

Lynn L. Tavenner (Va. Bar No. 30083)
Paula S. Beran (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219
Telephone:  (804) 783-8300
Telecopy:  (804) 783-0178

   *Proposed Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of January, 2014, a true and correct copy of the Motion of the Debtor for Entry of an Order Pursuant to Bankruptcy Code Sections 105(a), 363, 365, 506, 507(a), 553, 1107(a), 1108, and 1129(b) and Bankruptcy Rule 6003 Authorizing Continuation of Certain Customer Practices was served via electronic delivery and/or first-class mail to the Office of the United States Trustee, the Debtor's 20 largest unsecured creditors as identified in its Chapter 11 petition, the Debtor's known secured creditors, any known legal counsel for the Debtor's secured creditors, and all parties requesting service of pleadings in this case (all as listed on Schedule A attached hereto).


_____*/s/ Paula S. Beran*_____
Lynn L. Tavenner, Esquire (Va. Bar No. 30083)
Paula S. Beran, Esquire (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219
Telephone:  (804) 783-8300
Telecopy:  (804) 783-0178

Exhibit A

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond  Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FREE LANCE-STAR PUBLISHING CO. | ) | |
| OF FREDERICKSBURG, VA[1] | ) | Case No. 14-30315-KRH |
| | ) | |
| | ) | |
| Debtor. | ) | |

**ORDER GRANTING MOTION OF THE DEBTOR PURSUANT TO
BANKRUPTCY CODE SECTIONS 105(a), 363, 365, 506, 507(a), 553,
1107(a), 1108, AND 1129(b) AND BANKRUPTCY RULE 6003
AUTHORIZING CONTINUATION OF CERTAIN CUSTOMER PRACTICES**

Upon the motion (the "Motion")[2] of the Debtor for an order, pursuant to Bankruptcy

Code sections 105(a), 363, 365, 506, 507(a)(7), 553, 1107(a), 1108, and 1129(b)(2) and

Bankruptcy Rule 6003, authorizing, but not directing, the continuation of prepetition customer

practices and programs that the Debtor deems necessary and in the best interests of its estate,

creditors, and interest holders; and the Court having reviewed the Motion and the Declaration;

and the Court having determined that the relief requested in the Motion is in the best interests of

the Debtor, its estate, its creditors, and other parties in interest; and it appearing that proper and

adequate notice of the Motion has been given and that no other or further notice is necessary; and

upon the record herein; and after due deliberation thereon; and good and sufficient cause

appearing therefore, it is hereby

---

[1] The Debtor's address and TIN are as follows: 616 Amelia Street, Fredericksburg, VA  22401; 54-0216580.
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Lynn L. Tavenner, Esquire (Va. Bar No. 30083)
Paula S. Beran, Esquire (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219
Telephone:  (804) 783-8300
Telecopy:  (804) 783-0178

*Proposed Counsel for the Debtor*

**ORDERED, ADJUDGED, AND DECREED that:**

1. The Motion is GRANTED.

2. The Debtor is authorized, but not directed, to continue those prepetition Customer Programs and Community Programs and honor those Customer Obligations that it deems necessary and in the best interests of its estate, creditors, and interest holders, in the same manner as such programs and obligations were implemented and honored before the commencement of this chapter 11 case.

3. The Debtor is authorized, but not directed, to continue, renew, replace, modify and/or terminate such of its Customer Programs and/or Community Programs as its deems appropriate, in its discretion, and in the ordinary course of business, without further application to the Court.

4. The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

5. Nothing in the Motion shall be deemed a request for authority to assume, and nothing in this Order shall be deemed to constitute postpetition assumption or adoption of any agreement under Bankruptcy Code section 365.

6. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

7. The requirement under Local Rule 9013-1(G) of the Local Rules for the United States Bankruptcy Court for the Eastern District of Virginia to file a memorandum of law in connection with the Motion is hereby waived.

8. This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

Enter:

_____

UNITED STATES BANKRUPTCY JUDGE

I ask for this:


_____
Lynn L. Tavenner, Esquire (Va. Bar No. 30083)
Paula S. Beran, Esquire (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia 23219
Telephone:  (804) 783-8300
Telecopy:  (804) 783-0178

    *Proposed Counsel to the Debtor*


Seen and not objected to:


*/s/*_____
Robert B. Van Arsdale, Esquire
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219
Telephone:  (804) 771-2310

    *Assistant United States Trustee*


## CERTIFICATION

    I hereby certify that the foregoing proposed Order has been either served on _____ __, 2014 by first-class mail, postage prepaid, and/or electronic delivery or endorsed by all necessary parties.


_____
Lynn L. Tavenner, Esquire (Va. Bar No. 30083)
Paula S. Beran, Esquire (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219
Telephone:  (804) 783-8300
Telecopy:  (804) 783-0178

The Free Lance-Star Publishing Co.
Barter and Sponsorship Contracts

| Name | Contract Start Date | Contract Expiration | Annual Pmt. Amount or Value | Description |
|------|------|------|------|------|
| Baron "Deuce" Braswell Foundation | | | 2,800 | Sponsorship of 8th Annual Run Against Teen Violence in exchange for FLS placement of 3x5 ad. |
| Bluemont Concert Series | | | 13,846 | Sponsorship of Summer Concert Series in exchange for placement of 300x250 web ad, 2x6 ROP and Weekender ad for each concert and 3x5 Thank You ad. |
| Fredericksburg Area Museum & Cultural Center | 06/12/13 | 06/11/15 | 22,956 | Media Sponsor of the Via Colori Street Painting Festival in exchange for FLS providing ad placement, radio spots, and marketing staff for the event. |
| Fredericksburg Area Running Club | 04/19/13 | 04/18/15 | 48,122 | Title Sponsor of The Free Lance-Star Great Train Race & Caboose Run in exchange for FLS providing ad placement, radio spots, and marketing and radio staff for the event. |
| Fredericksburg Department of Parks, Recreation and Public Facilities | 01/15/13 | n/a | 5,718 | Sponsorship of Earth Day on the Rappahannock in exchange for placement of 3x10 ad. |
| Fredericksburg Regional Transit (FRED) | 05/27/13 | 05/23/14 | n/a | WFLS to furnish $65,025 in broadcast time and banner ad on radio website in exchange for FRED Transit displaying ad's on 31 buses and space to advertise events equaling $65,025 in trade value. |
| Fredericksburg Soap Box Derby | | | 43,783 | Title Co-Sponsor of The Free Lance-Star & Cox Classic in exchange for FLS providing ad placement, radio spots, and marketing and radio staff for the event. |
| Gerry Bertier #42 Foundation | | | 16,152 | Sponsor of events to benefit VCU Spinal Cord Injury Medicine Center including, Dinner Dance, Charity Golf Tournament and Bowling/Movie events. Sponsorship in exchange for ad space. |

The Free Lance-Star Publishing Co.
Barter and Sponsorship Contracts

| Name | Contract Start Date | Contract Expiration | Annual Pmt. Amount or Value | Description |
|---|---|---|---|---|
| Heritage Festival Committee | | | 17,519 | Sponsorship of July 4th Heritage Festival, 7/4/13, in exchange for placement of 6x10 ad, 300x250 web ad, and 4x8 Thank you ad. |
| Marine Corps Marathon | 01/29/13 | 01/31/15 | 22,223 | Media Sponsor of Historic Half Marathon & Healthy Life Expo in exchange for FLS providing ad placement and marketing staff for the event. |
| Mental Health America | | | 4,259 | Sponsorship of Walk for Mental Wellness in exchange for placement of 3x6 ad. |
| Quantico Marine Corps | | | 90,757 | Ongoing weekly Stars and Stripes ad. |
| Special Olympics Virginia | | | 2,498 | Sponsorship of 2013 Basketball Championships in exchange for placement of 2x5 ad and 728x90 web ad. |
| Spotsylvania Lions Club | | | 2,366 | Sponsorship of Adult Spelling Bee in exchange for FLS's placement of 2x5 ad. |
| Stafford County 350th Anniversary Blue Ribbon Committee | 11/01/13 | 01/31/15 | 100,000 | Sponsorship/Trade agreement to provide ad space, broadcast time up to $100k in exchange for Founder level sponsorship & purchase of a media schedule by the BRC. |

SERVICE LIST

Lynn L. Tavenner, Esq
Tavenner & Beran, PLC
20 N. 8th Street, Second Floor
Richmond, VA  23219

Robert A. Canfield, Esquire
Canfield, Baer, & Heller, LLP
2201 Libbie Ave., Suite 200
Richmond, VA 23230

S. Jason Teele, Esq
Lowenstein Sandler LLP
65 Livingston Avenue
Roseland, New Jersey 07068

William A. Gray, Esquire
Sands Anderson PC
1111 East Main Street Suite 2400
Richmond,  Virginia 23218-1998

International Forest Products LLC
Attn: Delores O'Kane
PO Box 711930
Cincinnati, OH 45271-1930

Pension Benefit Guaranty Corporation
1200 K Street, N.W.
Suite 270
Washington, DC 20005-4026

City of Fredericksburg
Attn: G.M. Jim Haney, Treasurer
Box 644
Fredericksburg, VA 2204-0267

Dominion VA Power
PO Box 26666
Richmond, VA 23216

White Birch Paper Company
Attn: Jill Morea
Box 513056
Philadelphia, PA 19175-3056

Eastman Kodak
Laura Heinzinger
343 State Street
Rochester, NY 14650

Flint Group North America Corp.
Attn: Laura McCray
1455 Paysphere Circle
Chicago, IL 60674

Midland Paper Company
Attn: Tonya Lynn
101 E. Palatine Road
Wheeling, IL 60090

Professional Building Maintenance, INC.
Attn: Justin Thacker
11 Ridgemore Circle
Fredericksburg, VA 22405

Arrow Marketing Group INC.
Attn: John Vefalco, District Manager
202 New Edition Court
Cary, NC 27511

Columbia Gas
Box 742529
Cincinnati, OH 45274-2529

Arbitron Company
Attn: Ellen Promisloff
9705 Patuxent Woods Drive
Columbia, MD 21046-1572

Resolute FP US INC.
Attn: David J. Patterson, President
5300 Cureton Ferry Road
Catawba, SC 29704

Washington Post
Attn: Bryant Desqeaux
1150 15th St. SW
Washington DC. 20071

SunTrust
PO Box 85024
Richmond, VA 23285

Rappaport Companies
Attn: Megan Murphy
8405 Greensboro Dr.
Eighth Floor
McLean, VA 22102

Utility Management Services
Attn: Lindsay Brent
PO Box 890134
Charlotte, NC 28289

Richmond Window Corp.
Attn: Lynn Burnette
2810 W. Cary St.
Richmond, VA 23226

Spotsylvania Historical
Attn: Terry Dougherty
9019 Old Battlefield Blvd.
Spotsylvania, VA 22553

Jobfetch.com
3rd Floor
Oak Park, IL 60304
In Care Of: Cathy Cloud

Robert B. Van Arsdale, Esquire
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219

Robert Orr
Sandton Capital
1340 Environ Way
Chapel Hill, NC 27517