UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FREE LANCE-STAR PUBLISHING CO. | ) | |
| OF FREDERICKSBURG, VA[1] | ) | Case No. 14-30315-KRH |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAM DOUGLAS PROPERTIES, LLC[2] | ) | |
| | ) | |
| Debtor. | ) | Case No.  14-30316-KRH |
| | ) | |

**MOTION OF THE DEBTORS FOR (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES, (B) SCHEDULING BID DEADLINE, AUCTION
DATE, AND SALE HEARING AND APPROVING FORM AND MANNER OF
NOTICE THEREOF; AND (C) APPROVING CURE PROCEDURES AND THE
FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER
APPROVING THE SALE OF TOWER ASSETS OF THE DEBTORS
FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and

each a "Debtor"), by and through their undersigned counsel, hereby jointly file this Motion (the

"Motion") for (i) the entry of an order, in substantially the form attached as Exhibit A hereto (the

"Bidding Procedures Order"), (a) approving bidding procedures (the "Bidding Procedures") to be

used for the proposed sale (the "Proposed Sale") of the Debtors' assets (the "Tower Assets"

---

[1] Debtor FLS' address and TIN are as follows: 616 Amelia Street, Fredericksburg, VA 22401; 54-0216580.
[2] Debtor William Douglas' address and TIN are as follows: 801 Hanover Street, Fredericksburg, VA 22401;
20-4012609.

Lynn L. Tavenner, Esquire (Va. Bar No. 30083)
Paula S. Beran, Esquire (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219
Telephone:  (804) 783-8300
Telecopy:  (804) 783-0178

Proposed Counsel for the Debtors

and/or "Assets") related to certain real property and improvements thereon in the form of transmission towers, which Tower Assets also generate approximately $13,100 per month in the form of rents (as further described hereafter) (b) scheduling the bid deadline, auction date, and sale hearing and approving the form and manner of notice thereof; and (c) approving procedures to cure any default pursuant to  section 365(b)(1) of the Bankruptcy Code and the form and manner of notice thereof; and (ii) following a subsequent hearing (the "Sale Hearing"), the entry of an order (the "Sale Order"), in substantially the form to be tendered at a later date, (a) approving the sale of the Tower Assets under and pursuant to an asset purchase agreement (the "Purchase Agreement" and/or Agreement), a draft of which is attached hereto as Exhibit B, to the successful purchaser (the "Prevailing Bidder") to be determined at auction (the "Auction"), free and clear of liens, claims and interests, (b) approving the Purchase Agreement and the obligations incurred by the Prevailing Bidder thereunder, and (c) granting related relief. In support hereof, the Debtors respectfully allege as follows:

## Jurisdiction and Venue

1.	On or about January 23, 2014 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.	The Debtors are continuing in possession of their properties and are operating and managing their business, as a Debtors-in-Possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.	The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## The Debtors' Business and Background

4.	The Free Lance-Star Publishing Co. of Fredericksburg, Va. ("FLS" or "the

Company") is a family-owned publishing, newspaper, radio and communications company located primarily in Fredericksburg, Virginia.  William Douglas Properties, L.L.C. ("William Douglas") is a related entity that owns a portion of the land pursuant to which FLS operates certain aspects of its business.

5.      For nearly 130 years, FLS has developed a reputation for integrity, credibility and innovation in the Fredericksburg region and the media industry.  The Free Lance was first published in 1885 when a group of local Fredericksburg merchants and businessmen created the paper to serve the news and advertising needs of the community.  In 1900, the company merged with The Daily Star and published two papers independently until 1926 when, under the leadership of Josiah P. Rowe Jr., they were combined into a single, six day a week newspaper: The Free Lance-Star. Rowe eventually became the owner and publisher of the newspaper.

6.      The sons of Josiah P. Rowe, Jr., Charles S. Rowe and Josiah P. Rowe III, assumed the duties of co-publishers after their father's death in 1949. In 1997, upon Charles' retirement, the family of Josiah P. Rowe III purchased total ownership of the business. Florence C. Barnick and Nicholas J. Cadwallender, Associate Publishers (and Rowe family members), served as the Company's leadership with Josiah P. Rowe III as President and Publisher.  In 1998, The Free Lance-Star responded to changing lifestyles and regional growth by adding a Sunday edition and moving from afternoon to morning publication.

7.      The Company diversified by expanding into radio broadcasting.  WFLS-AM, the Company's first radio station, began on-air operation in 1960, WFLS-FM in 1961, and today WFLS-FM's country format is the region's radio powerhouse.  The AM signal now broadcasts WNTX News, Talk, Sports. In 1994, WYSK (now WVBX) became the Company's second FM station. Situated in Spotsylvania County, its contemporary hits format is popular among younger listeners.  To round out radio offerings, the Company purchased WWUZ Classic Rock, licensed

to Bowling Green, in 2001.  All four stations continue on the air today.

8.      As the Company has grown to meet business and audience demand, its mission remained: to improve and connect the lives of the people in the communities it serves.  Indeed, as the internet emerged in the mid-1990's, the Company developed a web presence under the name *FLStarWeb.com*.  In 1999, the web address was changed to www.fredericksburg.com, and it has become the premier news, advertising and community portal for the region.

9.      In 2006, the Company developed plans to diversify the portfolio of offered services by significant expansion of the commercial printing business.  Branch Banking and Trust ("BB&T") pursued the Company to be chosen as the lender and, in 2007, the Company borrowed $50.8 million from BB&T.  The Company designed and built a state-of-the-art printing facility that began operation in 2009.  The building of the plant coincided with the worst recession since the Great Depression.  Newspaper and radio advertising declined precipitously as businesses reduced their marketing budgets.  Additionally, newspaper circulation revenue declined as many readers migrated to the internet for their news.

10.     As early as 2009, with Print Innovators still under construction, it became apparent the Company would not be in compliance with certain covenants of its loan agreement with BB&T and gave notice to BB&T of that fact.  In December of 2011, the Company signed a forbearance agreement with BB&T.  In 2011 Josiah P. Rowe III retired after 60 years as publisher, and Nicholas J. Cadwallender became President and Publisher, with Florence C. Barnick serving as Associate Publisher.  The Company continued to make timely payments to BB&T even though revenue continued to decline.  Efforts to restructure the business to become compliant with the loan covenants could not fully offset the continued revenue losses.  These efforts included reducing employee head count by one third from 454 full and part-time employees in 2007 to 303 full and part-time employees at the end of 2013.

11.     At BB&T's request, the Company, with the assistance of professional advisors, attempted to refinance the BB&T obligations.  When this was not successful, the Company, also with the assistance of professional advisors, pursued a sale as a going concern.  However, the Company and its advisors were not able to find a buyer at a price acceptable to BB&T.  In late June of 2013 BB&T, with permission of the Company, sold its loan to DSP Acquisitions, LLC, a company operated by Sandton Capital Partners (collectively, "Sandton" and/or the "Lender").

12.     Sandton  informed the Company that it wanted the Company to file a Chapter 11 bankruptcy case and sell substantially all of its assets pursuant to 11 U.S.C. § 363.  Sandton also indicated that it desired to be the entity that obtained the Company's assets and, if it did obtain possession of the Company's assets, it would continue the Company's businesses.

13.     With no better option available, the Company agreed to work with Sandton in connection with a Chapter 11 filing in an effort to maximize the value of its assets and in the hopes of providing a mechanism for the continuation of the Company's businesses and mission, which have developed over the past 129 years.

14.     Unfortunately, there remain material disagreements on the implication of certain facts.  Consequently, the parties have been unable to agree on (i) Sandton's adequate protection and (ii) the appropriate impact of those facts in relation to a sale transaction.

## Factual Background

### A.     The Proposed Sale

15.     The Debtors have determined, with the advice and assistance of their professionals, to pursue a sale of the Tower Assets.  However, in the interests of time, and in order to maintain maximum flexibility with respect to the Proposed Sale, the Debtors have opted not to continue in lengthy discussions and negotiations with prospective purchasers in an effort to select a stalking horse bid for the Tower Assets.  Rather, they are soliciting one or more

qualified bids for the Tower Assets without having provided any bid protections or other form of strategic advantage to any particular prospective bidder.[3]

16.    More specifically, the Debtors seek offers for the purchase of the Tower Assets, utilized in the ordinary course operation of the Business.  The Debtors propose to sell the Tower Assets to the highest or otherwise best bidder at Auction. The Proposed Sale will be on an "as is," "where is," and "with all faults" basis.  To the best of the Debtors' knowledge, no entity has a perfected security interest in the Tower Assets or the rents generated there from.

17.    The Tower Assets shall include the following:

"Tower Assets" which means all of the following assets of FLS:
certain equipment located on the Tower Real Property;
all permits issued to FLS relating to the ownership or operation of the assets described above;
all contracts related to the Tower Assets that are designated to be assumed;
any counterclaims, setoffs, or defenses that FLS may have with respect to any assumed liabilities designated by the purchaser of the Tower Assets;
all of FLS' insurance policies insuring the Tower Real Property or the other Tower Purchased Assets, to the extent assignable;
all of the FLS' indemnification rights under or with respect to the Assumed Liabilities or other Tower Purchased Assets; and
certain documents relating to the Tower Assets or the to the Assumed Liabilities.

"Tower Real Property" means the real property owned by FLS, together with all buildings, structures, fixtures, and improvements erected thereon, and as set forth on Schedule 1(nn) to Tower Agreement (as hereafter defined).

"Tower Lease" means the lease between Tower Purchaser, as lessor, and Buyer, as lessee.

18.    Simultaneously herewith, the Debtors have filed a similar motion related to the sale of the Debtors' remaining operational assets.

---

[3] The Debtors reserve the right to supplement/amend this Motion, or to seek separate relief, for the approval of bid protections to and for the benefit a prospective purchaser as they deem appropriate and in furtherance of a potential sale transaction.

19.     The Proposed Sale of the Tower Assets contemplated by the Purchase Agreement is subject to a competitive Auction process that will assure that the maximum value for the Tower Assets will be realized for the Debtors' estates and their creditors. Accordingly, the Debtors have filed this Motion seeking the establishment of bidding and sale procedures and, following a subsequent hearing (*i.e.*, the Sale Hearing), approval of the Proposed Sale of the Assets.

20.     Once the Bidding Procedures are approved, the Debtors with the assistance of their professionals will market the Tower Assets in the hope of generating one or more qualified bids for the Tower Assets.  The procedures provide direction to parties potentially interested in presenting a qualified bid.

21.     Pursuant to the procedures described below, among other things, potential bidders will receive notice of the Bidding Procedures for qualifying as a bidder and for submitting a qualified bid. In addition, creditors and other parties in interest will receive reasonable notice of the Sale Hearing to consider the Proposed Sale and have an opportunity to object thereto, and parties will also be afforded reasonable notice and an opportunity to object to the assumption and assignment of executory contracts and unexpired leases, if any, as part of the Proposed Sale.

## Specific Relief Requested

22.     This Motion seeks relief in two stages. First, the Motion seeks approval at an initial hearing of various procedures relating to the Proposed Sale and the scheduling of a second hearing (that is, the substantive Sale Hearing). Second, the Motion seeks approval of the Proposed Sale and related transactions at the Sale Hearing.

23.     The Purchase Agreement sets forth the terms and conditions under which the Proposed Sale transaction shall be consummated. Some of the important terms contained therein are as follows:

The purchase price for the Tower Assets shall consist of the following components:

> the assumption on the Closing Date by the Buyer of the Assumed Liabilities and Buyer's agreement to pay, perform and discharge in accordance with their respective terms all obligations of Seller thereunder; plus;
> the payment in full in immediately available funds on the Closing Date of the sum of $_____ (the "Cash Purchase Price"); plus
> the Cure Amounts.

24.     The Debtors may seek to assume and assign to the Prevailing Bidder certain executory contracts and unexpired leases to be designated by the Prevailing Bidder *(i.e.,* the Assumed Contracts). On or before ten (10) days prior to the Sale Hearing, the Debtors propose to file with the Court a schedule of executory contracts and unexpired leases that may be assumed and assigned as part of the Proposed Sale (the "Potential Assumed Contracts"); provided, however, that in the event this schedule is filed prior to the deadline, the Debtors shall be permitted to modify or supplement the schedules up to the deadline.

25.     Concurrently therewith, on or before ten (10) days prior to the Sale Hearing, the Debtors will serve the Notice of Bid Deadline, Auction, and Sale Hearing (as defined below) and a cure notice (the "Cure Notice") upon each counterparty to the Potential Assumed Contracts (each, a "Counterparty"). The Cure Notice shall identify the amounts, if any, that the Debtors believe are owed to each Counterparty to a Potential Assumed Contract in order to cure any defaults that may exist under such contract (the "Cure Amount"). Pursuant to the Bidding Procedures Order, the Cure Notice shall also state the applicable date, time and place of the Auction and the Sale Hearing, and provide the date and time by which any objection ("Cure Objection") to (i) the assumption and assignment of the applicable Potential Assumed Contract on the basis of lack of adequate assurance of future performance under section 365(b)(1) or (ii) the Cure Amount must be filed and served by the Counterparty. If a contract or lease is assumed and assigned under the Proposed Sale, then unless a Counterparty properly and timely files and

serves a Cure Objection pursuant to the Cure Notice, the Counterparty will receive payment from the Prevailing Bidder of the Cure Amount (if any) as set forth in the Cure Notice consistent with the terms and procedures set forth in the Purchase Agreement approved by the Court.

26.    Prior to the commencement of the Sale Hearing, the Debtors shall file with the Court a schedule (the "Assumed Contract Schedule") of Assumed Contracts elected by the Prevailing Bidder (as hereafter defined). At the Sale Hearing, the Debtors shall seek authority to assume and assign the Assumed Contracts to the Prevailing Bidder effective as of the closing of the Proposed Sale; provided, however, that the Debtors and the Prevailing Bidder together may agree to remove any Assumed Contract from the Assumed Contract Schedule at any time up to the closing of the Proposed Sale.

27.    The hearing to seek the entry of an order approving the Bidding Procedures is intended to, among other things, approve the Debtors' solicitation of qualified offers for the Tower Assets, establish the form and manner of notice of the Proposed Sale and establish the Bidding Procedures by which parties may participate in the Auction. A copy of the proposed Bidding Procedures that the Debtors seek to have approved are set forth in Exhibit 1 to the Bidding Procedures Order, which is attached hereto as Exhibit A and incorporated herein by reference.  The proposed Bidding Procedures provide, in relevant part, as follows:[4]

A.    **Bidding Procedures**[5]

**The Purchase Agreement**

28.    A copy of the proposed form Purchase Agreement is attached hereto as Exhibit B.

**Potential Bidders**

---

[4] To the extent that this summary and the terms of the Bidding Procedures are inconsistent, the terms of the Bidding Procedures shall govern.

[5] Any capitalized terms not defined herein shall have the meanings ascribed to them in the Purchase Agreement and Bidding Procedures.

29.     Any person seeking to become a Potential Bidder under the Bidding Procedures must deliver to the financial advisor to the Debtors, Protiviti, Inc., Attn: Suzanne B. Roski, 1051 East Cary Street, Suite 602, Richmond, VA 23219; the following documents (the "Preliminary Bid Documents"):

a.     an executed confidentiality agreement, in form and substance reasonably satisfactory to the Debtors; and

b.     written evidence of the person's financial and other capacity to consummate the Proposed Sale, in form and substance reasonably satisfactory to the Debtors.

30.     Within five (5) business days after a person delivers complete Preliminary Bid Documents, the Debtors shall determine, and shall notify such person, whether such person has submitted acceptable Preliminary Bid Documents so that such person may conduct due diligence (such person so designated as eligible by the Debtors, a "Potential Bidder").  Any person that is not designated as a Potential Bidder by the Debtors may not conduct due diligence.

31.     Anyone that desires to become a Qualified Bidder shall deliver a written copy of its Qualified Bid (as defined below) to: (i) counsel to the Debtors, Tavenner & Beran, PLC, Attn: Lynn L. Tavenner, Esquire, 20 North Eighth Street, Second Floor, Richmond, VA 23219; and (ii) the financial advisor to the Debtors, Protiviti, Inc., Attn: Suzanne B. Roski, 1051 East Cary Street, Suite 602, Richmond, VA 23219 (collectively, the "Notice Parties"), so as to be received no later than 5:00 p.m. (Eastern Time), on April 22, 2014 (the "Bid Deadline").  Only Qualified Bidders who are eligible to participate in the Auction.

32.     The Debtors may (i) at any time require a Potential Bidder to provide additional evidence of its financial or other ability to consummate the Proposed Sale, and (ii) based on the additional evidence provided, exclude any Potential Bidder from conducting a due diligence investigation or otherwise participating in the Auction. The Debtors may also work with parties

who submit offers on or before the Bid Deadline in an attempt to qualify the same as a Qualified

Bid such that said party may participate at the Auction.

33.     Interested bidders requesting information about the qualification process should

contact Protiviti.

## Due Diligence

34.     Only Potential Bidders may conduct due diligence.  Potential Bidders desiring to

conduct due diligence should contact Protiviti.  The Debtors and their advisors are not required

to furnish any information of any kind whatsoever relating to the Tower Assets to any person or

entity that is not a Potential Bidder.  The Debtors and their advisors shall coordinate the efforts

of all Potential Bidders in conducting a due diligence investigation in connection with a potential

bid.  After the Bid Deadline, the Debtors and their advisors are not required to furnish any

information of any kind whatsoever relating to the Assets to any person or entity that is not a

Qualified Bidder (as defined below).

## Form and Content of a Qualified Bid

35.     A "Qualified Bid" is a bid received by the Notice Parties before the Bid Deadline

that:

        a.     is formal, binding and unconditional, except those conditions (other than

any unperformed due diligence) expressly set forth in the form of asset purchase agreement to be

delivered by such Potential Bidder;

        b.     is not conditioned on any unperformed due diligence;

        c.     includes the following documents:

            1)     current financial statements of the Potential Bidder for the

Potential Bidder's last fiscal year (or, if the Potential Bidder is an entity created to purchase the

Assets, such financial statements from the Potential Bidder's parent or other appropriate

affiliated company), and current financial statements for any subsequent fiscal quarter, or such

other financial documentation reasonably satisfactory to the Debtors; written evidence of a

financing commitment (not subject to any conditions) or other source of cash, and tables setting

forth the sources and uses of funds for the Proposed Sale, that demonstrate such Potential

Bidder's financial and other capability to close the Proposed Sale and to provide adequate

assurance of future performance under any executory contracts and unexpired leases being

assumed and assigned, in all cases which are in form and substance reasonably acceptable to the

Debtors (the "Financial Documents");

2)      an executed Purchase Agreement, together with a copy of the asset

purchase agreement submitted by such Potential Bidder marked to show changes to the Purchase

Agreement;

3)      a letter (i) stating that the Potential Bidder has read and agrees to

be bound by the terms and conditions of the Bidding Procedures, (ii) setting forth contact

information for the Potential Bidder, its authorized representative and its counsel, and as to each,

such person's full name, company or firm, physical address or other address at which such

person receives overnight deliveries, telephone number, facsimile number and email address, (iii)

stating that the Potential Bidder has not engaged in any collusion with respect to its bid, and (iv)

acknowledging that: (a) the Potential Bidder has had an opportunity to examine the Debtors'

assets and liabilities before making its bid, (b) the Potential Bidder has relied solely upon its own

independent review, investigation or inspection of any documents in making its bid and (c) the

Potential Bidder did not rely upon any written or oral statements, representations, promises,

warranties or guaranties whatsoever, whether express or implied, by operation of law or

otherwise, regarding the Debtors' assets or liabilities, or the completeness of any information

provided in connection with the Debtors' implementation of the Bidding Procedures, in each

case except as expressly stated in such letter;

> 4) evidence of authority such as a copy of a board resolution or

similar document demonstrating the authority of the Potential Bidder to make a binding and

irrevocable bid on the terms proposed; and.

> d. remains open and irrevocable until the earlier of (a) the date of the closing

of the Proposed Sale, and (b) May 30, 2014;

> e. is not subject to any material condition precedent to closing that is not

contained in the Purchase Agreement, including obtaining financing, any internal or equity

holder approval contingency, the outcome of unperformed due diligence, or any bid protections

(including a breakup fee, termination fee, expense reimbursement or similar type of payment);

> f. the Debtors determine is reasonably likely (based on the Financial

Documents, the Potential Bidder's history and experience in consummating similar transactions,

transaction structure and execution risk, or other considerations) to be consummated if selected

as the Prevailing Bid; and

> g. includes a minimum good faith deposit in the form of a cashier's check,

wire transfer or other immediately available funds in an amount equal to at least five (5%)

percent of the Cash Component of the Purchase Price.

> 36. The Debtors shall notify any Potential Bidder promptly upon the Debtors'

determination of whether its bid is a Qualified Bid. Any Potential Bidder so notified shall be a

"Qualified Bidder" and its bid shall be a "Qualified Bid" for purposes of these Bidding

Procedures and the Auction. Between the date the Debtors notify a Potential Bidder that it is a

Qualified Bidder and the Auction, the Debtors may discuss, negotiate or seek clarification of any

Qualified Bid from a Qualified Bidder. Each Potential Bidder, whether or not submitting a

Qualified Bid, is deemed to have submitted to the exclusive jurisdiction of the Bankruptcy Court

with respect to all matters related to bids, the Auction and the Proposed Sale.

## Auction and Overbids

37.    The Debtors shall conduct an Auction if, and only if, one or more Qualified Bids

have been timely received. The Auction shall commence at 11:00 a.m. (Eastern Time) on April

28, 2014 at the offices of Tavenner & Beran, PLC, 20 North Eighth Street, Richmond, VA

23219, or such other time or place as the Debtors, at least one (1) day before the Auction,

notifies all Qualified Bidders who have submitted Qualified Bids. Only a Qualified Bidder who

has submitted a Qualified Bid may participate at the Auction.  Unless otherwise agreed by the

Debtors, a Qualified Bidder participating in the Auction may appear at the Auction only in

person or through a representative who is duly authorized to bind the Qualified Bidder to any

overbid.  Based upon the terms of the Qualified Bids submitted by the Qualified Bidders, and

such other information as the Debtors reasonably determine is relevant, the day before the

Auction commences, the Debtors shall notify in writing the Qualified Bidders participating in the

Auction which Qualified Bid the Debtors have determined to be the highest or otherwise best

Qualified Bid and which notification shall also include a copy of such Qualified Bid. In addition

to the foregoing, the Auction shall be conducted as follows:

a.    the Debtors, with the assistance of their advisors, shall conduct an open

Auction on the record, recorded by a court reporter and calling for incremental bids from the

Qualified Bidders participating in the Auction, with minimum overbid increments being in an

amount not less than $25,000.00 (the "Overbid Increment");

b.    at the Qualified Bidder's request, Qualified Bidders may caucus privately

among themselves at any time, with or without the participation of the Debtors and their

advisors, but the Debtors may impose reasonable time restrictions on such caucuses so that the

Auction may continue and be completed in an orderly and timely manner.  Any Qualified Bidder

who fails to make a bid within any time period established by the Debtors may be deemed to

have affirmatively withdrawn from the Auction and shall no longer participate in the Auction;

c.    Qualified Bidders may increase their bids at the Auction, in accordance

with the conditions set forth herein, as many times as they wish; but a Qualified Bidder that

wishes to submit a bid that is less than the minimum incremental amount of $25,000.00 may do

so, but only by announcing that such bid is such Qualified Bidder's highest or otherwise best bid

and, if topped, such Qualified Bidder shall no longer participate in the Auction.  Bidding among

any remaining Qualified Bidders shall continue to be in $25,000.00 Overbid Increments;

d.    each Qualified Bid, and each and every bid made at the Auction, shall

remain open, irrevocable and subject to acceptance by the Debtors (notwithstanding the Debtors'

designation of any other or subsequent bid as a "higher or better" bid, a Prevailing Bid or a

Back-Up Bid) until the earlier of (a) the date of the closing of the Proposed Sale, (b) May 30,

2014, and (c) if such bid is not the Prevailing Bid or the Back-up Bid (as those terms are defined

below), the date on which the Sale Order is entered;

e.    the Debtors reserve the right to announce reductions or increases in the

Overbid Increment at any time during the Auction and to restrict Qualified Bidders from passing

in more than one round of bidding;

f.    bidding at the Auction will begin with the Qualified Bid(s) that the

Debtors have determined prior to the commencement of the Auction is/are the highest and

otherwise best bid(s) for the Tower Assets and continue, in one or more rounds of bidding, so

long as during each round at least one subsequent bid (a "Subsequent Bid") is submitted by a

Qualified Bidder that the Debtors determine is higher or better than the previous bid.  The

Debtors shall announce the material terms of each Subsequent Bid at the Auction, and shall

disclose their valuation of the total consideration offered in each such Subsequent Bid (and the basis for its determination) in order to (a) confirm that each Subsequent Bid meets the minimum bid increment set by the Debtors for the round in which such Subsequent Bid was submitted and (b) to provide a floor for further Subsequent Bids;

g.      to the extent that Qualified Bidders seek to modify the noneconomic terms of their asset purchase agreement in connection with Subsequent Bids, they shall disclose such modifications in connection with a Subsequent Bid; and

h.      the Debtors may, in their discretion, commence the Auction by considering any Qualified Bids for individual assets or clusters of assets prior to considering any Qualified Bids for the Tower Assets.

## Selection of Prevailing Bid and Back-Up Bidder

38.      Concurrently with the conclusion of the Auction, the Debtors, after consulting with their advisors, shall (i) review each Qualified Bid on the basis of financial and contractual terms and factors relevant to the Sale Process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) identify the highest or otherwise best offer (the "Prevailing Bid"; the Qualified Bidder having submitted the Prevailing Bid, the "Prevailing Bidder") and the next highest or otherwise best offer (the "Back-Up Bid"; the Qualified Bidder having submitted the Back-Up Bid, the "Back-Up Bidder"). The Debtors shall determine the Prevailing Bid and the Back-Up Bid by considering, among other things, (i) the amount and form of consideration to be paid, (ii) the changes to, and conditions contained in, the form of asset purchase agreement submitted (as compared to the Purchase Agreement), (iii) the extent to which such changes or conditions are likely to delay closing of the Proposed Sale, and the anticipated cost to the Debtors' estates of such changes, conditions or delay, (iv) if applicable, the nature of the Qualified Bidder's financing commitment (including the conditions, if any,

contained in such financing commitment), (v) the Qualified Bidder's ability to close a Proposed

Sale and the timing thereof; and (vi) transaction structure and execution risk.

39.     If, for any reason, the Prevailing Bidder fails to consummate timely the

transactions contemplated by the Prevailing Bid and the Sale Order, or if the conditions to

closing the transaction as set forth in the Purchase Agreement are unable to be met in connection

with such Prevailing Bidder, the Debtors may (i) retain the Prevailing Bidder's deposit as part of

their damages for the Debtors' estates, except as may otherwise be provided in the Purchase

Agreement, and (ii) at the Debtors' sole option, to be exercised not later than 45 days after the

Sale Hearing unless the Back-Up Bidder consents in writing to a longer period, declare the Back-

Up Bidder as having submitted the highest or otherwise best bid and consummate the Back-Up

Bid without further approval by or from the Bankruptcy Court. Neither the Prevailing Bid nor the

Back-Up Bid may be modified or withdrawn without the written consent of the Debtors.

## Procedures With Respect to Bid Deposits

40.     The Debtors shall return any deposit and shall terminate any Qualified Bid

promptly after the Bankruptcy Court approves the Prevailing Bid and the Back-Up Bid and

enters the Sale Order, except for a Qualified Bid and a deposit submitted by (i) the Prevailing

Bidder, (ii) the Back-Up Bidder, or (iii) any bidder that has forfeited its deposit as set forth

below. The Debtors shall return any Back-Up Bid deposit and shall terminate the Back-Up Bid

promptly after the Debtors close a transaction with the Prevailing Bidder, to the extent not

previously returned and terminated. Except as may otherwise be provided in the Purchase

Agreement, a Qualified Bidder forfeits its deposit if it (i) withdraws its Qualified Bid or any

subsequent bid made by it at the Auction before the Bankruptcy Court approves the Prevailing

Bid, or (ii) is the Prevailing Bidder and (a) withdraws its Qualified Bid or any subsequent bid

made by it at the Auction without the Debtors' written consent or (b) materially breaches the

terms and conditions of its Qualified Bid or any subsequent bid made by it at the Auction.

### **"As Is, Where Is"**

41.     The Proposed Sale of the Tower Assets shall be on an "as is, where is" basis and

without representations of warranties of any kind, nature, or description by the Debtors, their

agents or estates, except to the extent set forth in the Purchase Agreement (or such form of

purchase agreement submitted by the Prevailing Bidder and agreed upon by the Debtors).

### **Reservation of Rights**

42.     The Debtors may, in their reasonable discretion: (i) determine whether a person or

entity is eligible to be a Potential Bidder, (ii) determine whether a Potential Bidder is eligible to

be a Qualified Bidder, (iii) determine whether a Qualified Bid is the highest or otherwise best

proposal and which is the next highest or otherwise best proposal, (iv) reject any bid that is (a)

inadequate or insufficient, (b) not submitted in conformity with the requirements of the Bidding

Procedures Order or the requirements of the Bankruptcy Code, or (c) contrary to the best

interests of the Debtors and their estates, (v) impose additional terms and conditions with respect

to any or all Qualified Bidders that are not inconsistent with the Bidding Procedures Order or any

other order of the Bankruptcy Court, (vi) extend the deadlines set forth herein, subject to the

terms of the Purchase Agreement and the Bidding Procedures Order, (vii) modify the Auction

and Bidding Procedures to promote the greatest recovery to the Debtors' estates in a manner not

inconsistent with the Bidding Procedures Order, and (viii) adjourn or cancel the Auction if no

Qualified Bids have been timely submitted or adjourn the Sale Hearing in open court without

further notice.

43.     At any time, in their sole discretion, the Debtors may elect not to proceed with the

Auction or the Proposed Sale, without liability of any kind to any Potential Bidder or Qualified

Bidder.

B.      **Proposed Notice Procedures**

44.      The Debtors will cause to be served, within five (5) business days after issuance of the Bidding Procedures Order, by U.S. first-class mail, postage prepaid, copies of (i) the notice of the Bid Deadline, Auction and Sale Hearing, (the "Notice of Bid Deadline, Auction, and Sale Hearing"), (ii) the Bidding Procedures Order including the Bidding Procedures attached thereto as Exhibit 1 and (iii) the Motion (the Notice of Bid Deadline, Auction, and Sale Hearing, the Bidding Procedures Order and the Bidding Procedures, and the Motion, collectively, the "Sale Package"), upon: (a) all potential buyers previously identified or solicited by the Debtors or Protiviti and any additional parties who have previously expressed an interest to the Debtors or Protiviti in potentially acquiring the Tower Assets, (b) other potentially interested parties identified by the Debtors or their advisors, (c) the Office of the United States Trustee, (d) counsel for the Lender, (e) all parties in interest who have requested notice under Bankruptcy Rule 2002, (f) the Notice Parties, (g) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Tower Assets, and (h) all applicable federal, state and local regulatory or taxing authorities or recording offices which are known by the Debtors to have an interest in the relief requested in the Motion, including the FCC.

45.      Further, the Debtors will cause to be published a modified publication version of the Notice of Bid Deadline, Auction, and Sale Hearing once in *The Free Lance-Star* prior to the Auction.

46.      To be considered by the Court, any objections to the Proposed Sale of the Tower Assets to the Prevailing Bidder or to the terms of the Purchase Agreement (or to the terms of the asset purchase agreement submitted by the Prevailing Bidder) shall (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objecting party, the nature and amount of any claims or interest held or asserted against the Debtors' estates or their

properties, the basis for the objection and the specific grounds therefore and (d) be timely filed

with the Court and served on the following (collectively, the "Objection Notice Parties"): (i) the

Office of the United States Trustee, Attn: Robert B. Van Arsdale, Esquire, 701 East Broad Street,

Suite 4304, Richmond, VA 23219; and (ii) Debtors' Counsel, Tavenner & Beran, PLC, Attn:

Lynn L. Tavenner, Esquire, 20 North Eighth Street, Second Floor, Richmond, VA 23219.

47.     The Debtors request that any entity that fails to file and serve its objection before

the expiration of the Sale Objection Deadline (as established in the entered Bidding Procedures

Order) and otherwise in accordance with the Bidding Procedures Order shall be prohibited from

asserting at the Sale Hearing or at any time thereafter any objection to the Motion or the

consummation and performance of the Proposed Sale as contemplated by the terms of the

Purchase Agreement (or by the terms of the asset purchase agreement submitted by the

Prevailing Bidder), including the transfer of the Tower Assets free and clear of all liens, claims

and interests other than the Assumed Liabilities and any permitted encumbrances.

**C.     <u>Approval of Proposed Sale</u>**

48.     The Debtors request that, at the conclusion of the Sale Hearing, the Court enter

the Sale Order approving the Proposed Sale of the Tower Assets, free and clear of liens, claims,

interests, other than the Assumed Liabilities and any permitted encumbrances, in accordance

with the terms and conditions contained in the Purchase Agreement (or the terms of the asset

purchase agreement submitted by the Prevailing Bidder and agreed to by the Debtors) to the

Prevailing Bidder, and granting such other relief as is necessary to effectuate the transactions

contemplated by the Purchase Agreement (or such other form of asset purchase agreement

submitted by the Prevailing Bidder and agreed to by the Debtors).

49.     The Debtors also request that the Court waive the fourteen (14) day stay that

otherwise may be applicable under Bankruptcy Rules 6004(h) and 6006(d), so that the Bidding

Procedures Order and the Sale Order are effective immediately upon entry.

## BASIS FOR RELIEF REQUESTED

50.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the
ordinary course of business may be by private sale or public auction.  The Debtors have
determined that a sale of the Tower Assets pursuant to the Purchase Agreement, subject to a
process in which interested parties may make one or more qualifying bids and participate in an
open Auction, will enable the Debtors to obtain the most consideration possible for the Tower
Assets, for the benefit of the Debtors' creditors and these estates.  The proposed Bidding
Procedures will facilitate that objective.

51.     The Debtors have sound business reasons for embarking upon a sale of their
Tower Assets in an expeditious fashion.  While the Business is operationally sound, the Debtors'
balance sheet reflects far too much secured indebtedness for these businesses and it cannot be
sustained; an orderly liquidation process that facilitate a sale as a going concern in the form of
the Proposed Sale will, in all likelihood, generate greater recoveries for creditors than a
piecemeal liquidation, and no one could fairly argue otherwise.

### D.     The Proposed Bidding Procedures Are Reasonable And Appropriate

52.     A number of courts have made clear that a debtor or trustee's business judgment
is entitled to substantial deference with respect to the procedures to be used in selling assets from
the estate. *See, e.g., In re Integrated Resources, Inc.*, 147 B.R., 650, 656-57 (Bankr. S.D.N.Y.
1992). The paramount goal in any proposed sale of property of the estate is to maximize the
proceeds received by the estate. *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir.
1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the
estate at hand."); *Integrated Resources*, 147 B.R. at 659 (same); *In re Atlanta Packaging
Products, Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) (same).

53.     The proposed Bidding Procedures will allow the Debtors to consider Qualified Bids for the Tower Assets and, if they receive such bids, to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially able bidders who demonstrate the ability to close a transaction. This will increase the likelihood that the Debtors will receive the greatest possible consideration for the Tower Assets. The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious matter, balancing the Debtors' desire to maximize recovery for the benefit of the Debtors' estates and creditors with the need to provide Potential Bidders a fair and reasonable opportunity to submit Qualified Bids.

54.     Because the Debtors have not engaged in a full marketing and sales process prior to the date hereof, they wish to afford prospective bidders a full and fair opportunity to conduct the requisite due diligence and formulate a meaningful bid for the Tower Assets.  In this connection, the Debtors are operating on a positive cash flow basis and so are not forced to forego adequate marketing in order to preserve the value of their assets. Accordingly, the Debtors are proposing a timeline that is reasonably calculated to allow Potential Bidders to effectively explore a possible strategic transaction and proffer one or more offers for the Tower Assets, in addition to allowing Protiviti to canvas the marketplace for potential strategic and financial acquirers, rather than the more expedited timeline that the Court may experience where circumstances dictate a truncated sale process.

55.     Specifically, the Debtors are requesting that the Proposed Sale proceed along the following timetable:

**April 22, 2014** – Bid Deadline

**April 28, 2014** – Auction (if one or more Qualified Bids is/are submitted by the Bid Deadline)
**April 30, 2014** – Sale Hearing (subject to court's calendar)

This timetable strikes a fair balance between the desire to implement an expeditious Sale Process

and the need to afford Potential Bidders adequate time to conduct due diligence concerning these
businesses and the Tower Assets and formulate and proffer a meaningful bid.

**E.      The Sale Of Tower Assets Pursuant To The Purchase Agreement Is
Authorized By Section 363(b) Of the Bankruptcy Code.**

56.      Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice
and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of
the estate." *See* 11 U.S.C. § 363(b)(1). Although Bankruptcy Code section 363 does not specify a
standard for determining when it is appropriate for a court to authorize the use, sale or lease of
property of the estate, courts in this District have required that such use, sale or lease be based
upon a debtor's (or trustee's) sound business judgment. *See, e.g., In re Decora Indus., Inc.,* 202
WL 32332749, *2 (D. Del. May 20, 2002); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169,
176 (D. Del. 1991); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (Bankr. D. Del.
1999). Courts in other circuits are generally in accord. *See, e.g., In re Lionel Corp.,* 722 F.2d
1063, 1071 (2d Cir. 1983).

57.      The business judgment rule shields a trustee or debtor's management from
judicial second-guessing. *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y.
1986) ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a
trustee articulates a valid business justification, "[t]he business judgment rule 'is a presumption
that in making a business decision the [trustee] acted on an informed basis, in good faith and in
the honest belief that the action was in the best interests of the [estate].'" *Integrated Resources*,
147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

58.      Thus, if a trustee's actions satisfy the business judgment rule, then the transaction
in question should be approved under section 363(b)(1). When applying the "business judgment"
standard, courts show great deference to a trustee's business decisions. *See In re First Wellington
Canyon Assocs.*, 1989 U.S. Dist. LEXIS 10687 at *8-*9 (N.D. Ill. Sept. 8, 1989) ("Under this

test, the debtor's business judgment ... must be accorded deference unless shown that the

bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained

discretion."); *In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 267 at *45-*50 (Bankr. D.

Del. Mar. 12, 2001) (describing business judgment rule as "very deferential standard").

59.     The Debtors have amply demonstrated sound business judgment in proffering the

Purchase Agreement, which provides for a sale of the Tower Assets to the party submitting the

highest or otherwise best bid at Auction. The prompt sale of the Tower Assets presents the best

opportunity to maximize value for the Debtors' estates. Pursuant to the Purchase Agreement, or a

similar such agreement from a Qualified Bidder that is acceptable to the Debtors, it is reasonably

expected that the Prevailing Bidder will provide substantial consideration to the Debtors' estates.

Accordingly, the value to be obtained for the Debtors' estates through this process should be

significant and will likely bring about a meaningful result for the Debtors' creditors.  The

Debtors submit that the Auction and Proposed Sale satisfies the business judgment test.

60.     In addition, the Debtors aver that the consideration expected to be paid under the

Purchase Agreement will be fair and reasonable.  In fact, the fairness and reasonableness of the

consideration to be paid for the Tower Assets by a Prevailing Bidder that may be approved at the

Sale Hearing will be conclusively demonstrated by the exposure of the Assets to the

marketplace. As noted, the Debtors' financial advisor, Protiviti, is actively assisting with the

Proposed Sale transaction and will assist with respect to the marketing of the opportunity after

approval of the Bidding Procedures.  The Debtors have proposed a fair and open process for

achieving a sale transaction, irrespective of which person or entity ultimately may acquire the

Assets.

61.     For all of these reasons, the Debtors have determined that the best opportunity to

maximize value for the Debtors' estates is to sell the Tower Assets on the terms and as set forth

in this Motion.  Accordingly, it is a valid exercise of the Debtors' business judgment to seek

approval of the Bidding Procedures and the Proposed Sale.

> **F.**     **The Sale Of Assets Free And Clear Of Liens, Claims And Interests Is
> Authorized By Section 363(f) Of The Bankruptcy Code.**

62.     The Debtors respectfully submit that it is appropriate to sell the Assets free and

clear of liens, claims, and interests pursuant to section 363(f) of the Bankruptcy Code, with any

such liens, claims or interests other than Assumed Liabilities and permitted encumbrances

attaching to the net sale proceeds, if any, to the extent applicable. Section 363(f) of the

Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and

encumbrances if:

a.     applicable nonbankruptcy law permits sale of such property free and clear of such

interests;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater

than the value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code,

which provides that "[t]he Court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

63.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive,

satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free

and clear" of liens and interests. *In re Dundee Equity Corp.,* 1992 Bankr. LEXIS 436, *12

(Bankr. S.D.N.Y. Mar. 6,1992) ("Section 363(f) is in the disjunctive, such that the sale free of

the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re*

*Wolverine Radio Co.,* 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code

section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and

clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

64.     While to the best of the Debtors' knowledge, no entity has a perfected security

interest in the Tower Assets or the rents generated there from, the Debtors believe that, to the

extent any valid lienholders exist, one or more of the tests of section 363(f) will be satisfied with

respect to the transfer of the Tower Assets pursuant to the Purchase Agreement (or by the terms

of an asset purchase agreement submitted by the Prevailing Bidder).  In particular, any valid

lienholders that exist will be adequately protected by having their liens, if any, in each instance

against the Debtors or their estates, attach to any net cash proceeds of the Tower Assets, after

costs of sale, in the same order of priority, and with the same validity, force and effect that such

creditor had prior to the sale, subject to any claims and defenses that the Debtors and their estates

may possess with respect thereto.  Accordingly, section 363(f) authorizes the transfer and

conveyance of the Assets free and clear of any such claims, interests, encumbrances and liens.

65.     The Debtors also satisfy section 363(f)(3) of the Bankruptcy Code because the

"price at which such property is to be sold is greater than the aggregate value of all liens on such

property." 11 U.S.C. § 363(f)(3).  Because the amount of consideration that is expected to be

paid by the Prevailing Bidder for the Assets represents an amount equal to or greater than the

aggregate value of any liens, section 363(f)(3) is satisfied.  The Debtors also satisfy section

363(f)(5) because all parties entitled to assert liens, claims, encumbrances or interests can be

compelled under state law to accept a money satisfaction of their interests.  Accordingly, the

Debtors request that the Tower Assets be transferred to the Prevailing Bidder free and clear of

any and all liens, claims and interests other than the Assumed Liabilities and any permitted

encumbrances.

### G.    The Assets Should Be Sold Free And Clear Of Successor Liability Claims.

66.    Under the Purchase Agreement, a Prevailing Bidder is assuming only those

Assumed Liabilities and any permitted encumbrances expressly set forth therein.  The Prevailing

Bidder, therefore, should not be liable for any of the Debtors' liabilities in connection with the

Proposed Sale of the Tower Assets as a successor to the Debtors' business or otherwise, unless

expressly assumed.  Extensive case law exists providing that claims against a winning bidder are

directed to the proceeds of a free and clear sale of property and may not be asserted against a

buyer subsequently.

67.    A number of courts have held that a buyer of a debtor's assets pursuant to a

section 363 sale takes free from successor liability resulting from pre-existing claims.  *In re

Trans World Airlines Inc.*, 322 F.3d 283 (3d Cir. 2003) (holding that the sale free and clear of the

successor liability claims was properly authorized under § 363(f) because the claims were

connected to or arose from the assets being sold.). *See Ninth Ave. Remedial Group v. Allis-

Chalmers Corp.*, 195 B.R. 716, 732 (N.D. Ind. 1996) (stating that a bankruptcy court has the

power to sell assets free and clear of any interest that could be brought against the bankruptcy

estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville

Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with

intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re New England

Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale

included free and clear of Title VII employment discrimination and civil rights claims of debtor's

employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free

and clear of any interest permissible even though the estate had unpaid taxes); *American Living*

*Sys. v. Bonapfel (In re All Am. Of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. GA 1986)

(product liability claims precluded on successor doctrine in a sale of assets free and clear); *WBQ*

*P'ship v. Virginia Dept. of Med. Assistance Servs. (In re WBQ P'ship),* 189 B.R. 97, 104-05

(Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an

"interest" as used in section 363(f)).[6]

68.    The purpose of an order purporting to authorize the transfer of assets free and

clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis

to assert claims against the Prevailing Bidder arising from the Debtors' pre-sale conduct.  Under

section 363(f) of the Bankruptcy Code, the Prevailing Bidder is entitled to know that the Tower

Assets are not infected with latent claims that may be asserted against the Prevailing Bidder after

the proposed transaction is completed.

69.    Accordingly, consistent with the above-cited case law, including the seminal

decision *In re Trans World Airlines Inc.*, 322 F.3d 283 (3d Cir. 2003) – the order approving the

sale of the Assets should state that the Prevailing Bidder is not liable as a successor under any

theory of successor liability for claims that may encumber or otherwise relate to the Tower

Assets, including, without limitation, any encumbrances arising under a theory of successor

liability.

**H.      The Prevailing Bidder Is Expected To Be A Good Faith Purchaser And Is
          Entitled To The Full Protections of Section 363(m) Of The Bankruptcy Code.**

70.    The Debtors request that the Court find that the Prevailing Bidder is entitled to the

full protections of section 363(m) Bankruptcy Code. Courts have indicated that a party would

have to show fraud or collusion between the buyer and the debtor in possession or trustee or

---

[6] Even those courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of successor claims have nevertheless found that Bankruptcy Code section 105(a) provides such authority. *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of successor

other bidders in order to demonstrate a lack of good faith. *See In re Colony Hill Assocs.,* 111

F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good

faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or

the trustee, or an attempt to take grossly unfair advantage of other bidders."); *see also In re*

*Angelika Films 57th, Inc.,* 1997 U.S. Dist. LEXIS 7463 at *19-*28 (S.D.N.Y. May 29, 1997).

71.     Courts repeatedly have concluded that the sale of a debtor's principal assets

and/or significant assets is appropriate where there are sound business reasons and no evidence

of fraud or collusion. *See In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3rd Cir. 1986) (sale

of assets appropriate where purchaser acted in good faith, and there was no fraud, collusion

between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair

advantage of other bidders); *In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 980 (Banks.

Del. 2001) (citing Abbotts Dairies); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 178-79 (D.

Del. 1991). As discussed herein, there is ample business justification for the Proposed Sale of the

Assets, the sale and the Purchase Agreement have been pursued and proffered in good faith, and

there has been no fraud or collusion between the Debtors or any bidders.

72.     In this case, there is absolutely no indication of fraud or improper inside dealing

of any kind. The Purchase Agreement does not constitute an avoidable transaction pursuant to

section 363(n) and the Prevailing Bidder should receive all of the statutory protections afforded

good faith purchasers under section 363(m). Accordingly, the Debtors request that this Court

make a finding at the Sale Hearing that the Purchase Agreement (or the terms of the asset

purchase agreement submitted by the Prevailing Bidder and agreed to by the Debtors) and the

Prevailing Bidder are entitled to the full protections of Code section 363(m).

73.     The Debtors intend to offer evidence at the Sale Hearing to demonstrate that the

---

liability claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers

Prevailing Bidder is entitled to section 363(m) protection.

**I.     Authorization of Assumption and Assignment of Assumed Contracts**

74.     As set forth in the procedures proposed above, the Proposed Sale contemplates the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder, which will enhance the value of the Proposed Sale to the Debtors' estates by curtailing further administrative liability to the estates and eliminating substantial rejection claims. Accordingly, the Debtors request approval under section 365 of the Bankruptcy Code, and as part of the Proposed Sale, of the assumption and assignment of the Assumed Contracts to the Prevailing Bidder, notwithstanding any provisions in the Assumed Contracts, including those described in sections 365(b)(2) and (f)(l) and (3) of the Bankruptcy Code, that purport to prohibit such assignment.

75.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)     cures, or provides adequate assurance that the trustee will promptly

---

when necessary to carry out the provisions of title 11).

cure, such default;

(B)     compensates, or provides adequate assurance that the trustee will
promptly compensate, a party other than the debtor to such
contract or lease, for any actual pecuniary loss to such party
resulting from such default; and

(C)     provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. § 365(b)(1).

76.     Although section 365 of the Bankruptcy Code does not set forth standards for

courts to apply in determining whether to approve a debtor's decision to assume an executor

contract, courts have consistently applied a "business judgment" test when reviewing such a

decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific

Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir.

1977).  A debtor satisfies the "business judgment" test when it determines, in good faith, that

assumption of an executory contract will benefit the estate and the unsecured creditors. *In re

FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The assumption and assignment of the

Assumed Contracts will be a necessary part of the deal that the Debtors have struck with the

Prevailing Bidder and, as stated above, will benefit the estates.

77.     The Debtors will send the Cure Notices to all Counterparties to the Potential

Assumed Contracts by the date set forth in the Bidding Procedures Order, notifying such

Counterparties of the potential assumption by the Debtors and assignment to the Prevailing

Bidder of such contracts and leases. The Cure Notices will set forth the "cure" amounts owing on

each of the Potential Assumed Contracts, according to Debtors' books and records.

78.     Counterparties to the Potential Assumed Contracts will be given time (as will be

set forth in the Bidding Procedures Order and above) to file an objection to the proposed Cure

Amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a

particular cure amount, such cure amount shall be binding on the Debtors and the applicable

Counterparty. The payment of the Cure Amounts specified in the Cure Notices (or a different amount either agreed to by the Debtors or resolved by the Court as a result of a timely-filed objection filed by a Counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine, prior to the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to be cured to transfer the Assets to the Prevailing Bidder.

79.     The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). *See also, In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). If necessary, evidence of the Prevailing Bidder's ability to provide adequate assurances to Counterparties to the Assumed Contracts will be presented at the Sale Hearing. Moreover, any Qualified Bid that is selected as the highest and best bid will be required to contain evidence that the bidder can provide adequate assurance of future performance with respect to the Assumed Contracts.

80.     The Debtors propose to cure existing defaults, and provide adequate assurance of future performance, under the Assumed Contracts by requiring that the Prevailing Bidder pay all Cure Amounts in the context of the Purchase Agreement. Accordingly, assumption and assignment of the Assumed Contracts as part of the sale of the Assets at or subsequent to the closing of the Proposed Sale is appropriate under the circumstances.

**J.**      **Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

81.      Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale, or lease

of property … is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h). Also, Bankruptcy Rule 6006(d) provides that an

"order authorizing the trustee to assign an executory contract or unexpired lease … is stayed

until the expiration of [14] days after the entry of the order, unless the court orders otherwise."

Fed. R. Bankr. P. 6006(d). The Debtors request that any order approving the Purchase

Agreement (or the Bidding Procedures in connection with the Proposed Sale thereunder) be

effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules

6004(h) and 6006(d) are waived.

82.      The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented. *See* Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h)

and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order

otherwise" and eliminate or reduce the fourteen (14) day stay period, *Collier* suggests that the

fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close

immediately "where there has been no objection to the procedure." 10 Lawrence P. King, *Collier*

*on Bankruptcy*, 6004.10 (16th ed. 2010). *Collier* further provides that if an objection is filed and

overruled, and the objecting party informs the court of its intent to appeal, the stay may be

reduced to the amount of time actually necessary to seek a stay, unless the court determines that

the need to proceed sooner outweighs the interests of the objecting party. *Id.*

83.      To maximize the value received for the Assets, the Debtors seek to close the

Proposed Sale as soon as possible after the Sale Hearing, subject to the terms of the Purchase

Agreement and the Prevailing Bidders' closing conditions (if any). Accordingly, the Debtors

hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the lesser alternative, if an objection to the sale is filed and overruled by the Court, reduce the stay period to the minimum amount of time needed by the objecting party to seek a stay pending appeal.

## **CONCLUSION**

84.     The Debtors have proposed the sale of the Tower Assets after consideration of several strategic alternatives, having concluded that such sale is supported by a number of sound business reasons. The Debtors believe that a section 363 sale has the potential to maximize value for all constituents of these bankruptcy estates.

85.     The alternative to a sale may be a forced liquidation of the Debtors' assets, which result is likely to yield less value to creditors than the proposed section 363 sale. In either scenario, the Debtors expect that there will be insufficient proceeds generated to satisfy the Lender's claims in full. However, an orderly sale is reasonably expected to result in the highest and best possible bids for the Tower Assets, the assumption of a variety of contractual and trade obligations, and the greatest possible reduction in potential deficiency claims against these estates. Hence, the Debtors have reasonably determined that the Proposed Sale would provide the best and most efficient means for reorganizing the Debtors' affairs at this time.

86.     By the time that the Proposed Sale is presented for approval by the Court, the Debtors, with the assistance of Protiviti, will have extensively marketed the Assets and, to the extent multiple bids are received, will have conducted an Auction, all consistent with Bidding Procedures that the Debtors have requested that the Court approve pursuant hereto. As a result of such marketing efforts and the proposed Bidding Procedures, the Debtors believe that the Prevailing Bidder's (or Back-Up Bidder's) offer will be fully tested by the market and will constitute fair and reasonable consideration for the Tower Assets.

87.     In view of this, the sale of the Tower Assets is justified by sound business reasons and is in the best interests of the Debtors and their estates. Accordingly, pursuant to sections 105(a), 363(b) and 365 of the Bankruptcy Code, the Debtors respectfully request approval of the Proposed Sale to the Prevailing Bidder (or Back-Up Bidder) as delineated herein.

**Notice**

88.     No trustee, examiner or creditors' committee has been appointed in this chapter 11 case.

89.     Pursuant to Local Rule 2014-1, notice of this Motion will be given to the Office of the United States Trustee.  Thereafter, after obtaining a hearing date from the Court, notice of this Motion and the requisite hearing date will be given to: (a) the Office of the United States Trustee; (b) the twenty largest unsecured creditors, as identified in the Debtors' chapter 11 petition; (c) the Debtors' known secured creditors; (d) any known legal counsel for the Debtors' secured creditors; and (e) all parties requesting service of pleadings in these cases.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order attached hereto as Exhibit A and, following the subsequent Sale Hearing, enter the Sale Order and grant such other and further relief as this Court deems proper and just.

THE FREE LANCE-STAR PUBLISHING CO.
OF FREDERICKSBURG, VA and
WILLIAM DOUGLAS PROPERTIES, LLC

By:___*/s/ Lynn L. Tavenner*_____
          Proposed Counsel

Lynn L. Tavenner (Va. Bar No. 30083)
Paula S. Beran (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219

Telephone:  (804) 783-8300
Telecopy:  (804) 783-0178

*Proposed Counsel for the Debtors*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd[nd] day of January, 2014, a true and correct copy of the Motion of the Debtors for (I) an Order (A) Approving Bidding Procedures, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof; and (II) an Order Approving the Sale of the Debtors' Tower Assets Free and Clear of Liens, Claims and Interest was served via electronically delivery to the Office of the United States Trustee. After obtaining a hearing date from the Court, a true and correct copy of the Motion of the Debtors for (I) an Order (A) Approving Bidding Procedures, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof; and (II) an Order Approving the Sale of the Debtors' Tower Assets Free and Clear of Liens, Claims and Interest will be provided by first class mail, postage prepaid, to: the Office of the United States Trustee, the Debtor's 20 largest unsecured creditors as identified in its chapter 11 petition, the Debtor's known secured creditors, any known legal counsel for the Debtor's secured creditors (all as listed on Schedule A attached hereto).

_____*/s/ Lynn L. Tavenner*_____
Lynn L. Tavenner (Va. Bar No. 30083)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219
Telephone:  (804) 783-8300
Telecopy:  (804) 783-0178