IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

In re:  THE FREE LANCE-STAR PUBLISHING CO.          Case No. 14-30315-KRH
        OF FREDERICKSBURG, VA, *et al.,*             Chapter 11
                                                     (Jointly Administered)
                        Debtors.

## MEMORANDUM OPINION

On January 23, 2014 (the "Petition Date"), The Free Lance-Star Publishing Company of

Fredericksburg, VA ("The Free Lance-Star") and William Douglas Properties, LLC ("William

Douglas" and, together with The Free Lance-Star, the "Debtors") filed voluntary petitions for

relief under Chapter 11 of Title 11 of the United States Code.  11 U.S.C. §101 *et. seq.* (the

"Bankruptcy Code").  The Debtors' bankruptcy cases are being jointly administered pursuant to

the Court's Order of January 30, 2014.  The Debtors are continuing to operate their business as

Debtors-in-Possession ("DIP") under §§ 1107 and 1108 of the Bankruptcy Code.

The Debtors filed on the Petition Date a Motion to Sell Business Assets and a Motion to

Sell Tower Assets[1] (collectively, the "Sale Motions") seeking approval of bidding procedures for

an auction of substantially all of the Debtors' assets.  On March 10, 2014, the Court entered

orders approving the bidding procedures set out in each of the Sale Motions, including the right

---

[1]  The Debtors own and operate four radio stations in addition to its printing and newspaper businesses.  The Tower Assets are employed in broadcasting activities associated with the Debtors' operation of its radio business.  The Tower Assets include the Tower Parcels and the improvements thereon; certain equipment located on the Tower Parcels; all permits issued to the Debtors relating to the ownership or operation of the foregoing assets; all contracts related to the Tower Assets that are designated to be assumed; any counterclaims, setoffs, or defenses that the Debtors may have with respect to any assumed liabilities designated by the purchaser of the Tower Assets; all of the Debtors' insurance policies insuring the Tower Real Property or the other Tower Purchased Assets, to the extent assignable; all of the Debtors' indemnification rights under or with respect to the Assumed Liabilities or other Tower Purchased Assets; and certain documents relating to the Tower Assets or to the Assumed Liabilities.  The Sale Motions included a procedure for a separate sale of the Debtors' Tower Assets, as the Debtors assert that no entity has a lien on or security interest in the Tower Assets.

of DSP Acquisition, LLC ("DSP") to credit bid its claim against the Debtors' assets on which it
had valid liens or security interests, as either (i) agreed to by the Debtors, DSP, and the Official
Committee of Unsecured Creditors (the "Committee") or (ii) as determined by the Court at a
hearing to be held on March 24, 2014.

Also on March 10, 2014, DSP filed a Complaint (the "Complaint") initiating Adversary
Proceeding No. 14-03038 (the "Adversary Proceeding"). The Complaint seeks a declaration that
DSP has valid and perfected liens on substantially all of the Debtors' assets including the Tower
Assets. DSP has also filed a motion seeking summary judgment pursuant to Rule 56(c) of the
Federal Rules of Civil Procedure, as incorporated by Rule 7056 of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules") on all counts set forth in its Complaint (the
"Plaintiff's Motion for Summary Judgment"). DSP filed the Declaration of Allyson Brunetti in
support of the Complaint and Plaintiff's Motion for Summary Judgment.[2] The Debtors, who are
the named defendants in the Complaint, filed their own motion for summary judgment against
DSP (the "Defendants' Motion for Summary Judgment" and together with Plaintiff's Motion for
Summary Judgment, the "Cross Motions for Summary Judgment").

On March 24, 25, and 31, 2014, the Court conducted an evidentiary hearing (the
"Hearing") (i) to determine DSP's right to credit bid its claim against the Debtors' assets in
connection with the Sale Motions and (ii) to determine the validity, extent and priority of the
liens asserted by DSP in connection with the Cross Motions for Summary Judgment. At the
conclusion of the Hearing, the Court ruled that DSP did not have valid, properly perfected liens
on the Tower Parcels or the improvements thereon, the other Tower Assets, the FCC licenses, the

---

[2] An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts
that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters
stated. Fed. R. Civ. P. 56(c)(4).

rolling stock, insurance policies, and/or bank accounts. The Court also ruled that 11 U.S.C. § 552 prevented DSP from asserting a lien on any proceeds that may be derived from the disposition of any of the forgoing assets on which it did not have a valid lien as of the Petition Date. Accordingly, the Court denied Plaintiff's Motion for Summary Judgment and granted partial summary judgment in favor of the Debtors on Defendants' Motion for Summary Judgment.[3] The Court ruled that DSP could not credit bid a claim against assets on which it lacked a valid lien or security interest. The Court found that DSP had engaged in inequitable conduct that, under the circumstances, required the Court to limit DSP's credit bid right in order to foster a robust auction. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.[4]

The Court has subject-matter jurisdiction over the Sale Motions and the Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (K), (N) and (O). Venue is appropriate pursuant to 28 U.S.C. § 1409.

Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). DSP argues that, as the holder of a secured claim, the Bankruptcy Code gives it the right to credit bid its claim at such a sale. See 11 U.S.C § 363(k). The Debtors submit that "cause" exists in this case to limit the credit bid amount. See id. DSP, as the entity

---

[3] See Order and Memorandum Opinion of even date in Adversary Proceeding.

[4] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

asserting an interest in property of the estate, has the burden of proof on the issue of the validity,

priority, or extent of its liens. 11 U.S.C. § 363(p)(2). Because it is the filing of the objection

that creates a contested matter under Rule 9014 of the Bankruptcy Rules, the Debtors, as the

objecting parties, are treated as the movants and have the burden of proving cause under § 363(k)

of the Bankruptcy Code. *See In re DeSoto*, 33 C.B.C.2d 902, 905, 181 B.R. 704, 706 (Bankr. D.

Conn. 1995).

As a general rule, a "preponderance of the evidence" standard is appropriate in all

bankruptcy proceedings. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d. 755

(1991); *see, e.g., In re Santaella*, 298 B.R. 793, 799 (Bankr. S.D. Fla. 2002); *see also In re

Galanis*, 334 B.R. 685 (Bankr. D. Utah 2005). "Preponderance of the evidence" is the weight

accorded to the aggregate evidence on either side. It is synonymous with the term "greater

weight of the credible evidence." 30 Am. Jur. 2d Evidence § 1164, at 339 (1967). The Court

will apply the "preponderance of the evidence" standard to the issues at bar.

### Facts

The Free Lance-Star is a family-owned publishing, newspaper, radio, and

communications company located in Fredericksburg, Virginia (the "Company"). William

Douglas is a related entity that owns a portion of the land on which The Free Lance-Star operates

its business. The Free Lance-Star owns the Tower Assets, which include three parcels of real

estate (the "Tower Parcels"). The Tower Assets are the primary focus of the Sale Motions and

the Cross Motions for Summary Judgment. The Tower Assets are used predominately in The

Free Lance-Star's radio broadcasting operations. The first of the Tower Parcels is located at 122

Mountain Avenue in Stafford County, Virginia. The second of the Tower Parcels is located at

6701 Rumsey Lane in Spotsylvania County, Virginia. The third of the Tower Parcels is located

at 22601 Penola Road in Caroline County, Virginia. Between 1988 and 1998, The Free Lance-Star improved the Stafford County Tower Parcel by constructing a guy wired mast on the property. Towers were already erected on the Spotsylvania County and Caroline County Tower Parcels when the Debtors purchased those properties (collectively, the masts erected on the Tower Parcels, the "Towers").

In 2006, the Debtors developed a plan to expand their commercial printing business. To undertake this expansion, the Debtors borrowed funds from Branch Banking and Trust ("BB&T") in the approximate amount of $50.8 million (the "Loan"). To secure this Loan the Debtors granted liens on, and security interests in, certain of the Debtors' real and personal property. The Debtors did not agree to grant any liens on or security interests in the Tower Assets, nor did BB&T record deeds of trust covering the Tower Parcels. BB&T did not obtain or record any assignment of leases or rents concerning the Tower Parcels. The Credit Agreement makes no reference to granting liens on the Tower Assets, nor does the Security Agreement specifically reference the Tower Assets. It appears that during the time that BB&T held the Loan, BB&T did not record any financing statements perfecting a security interest in any of the Tower Assets.

With the Loan, the Debtors built a state-of-the-art printing facility that began operation in 2009. Construction of the facility coincided with the severe recession that began in December 2007 and ended in June 2009. In early 2009 the Company fell out of compliance with certain of the Loan covenants contained in its Loan agreement with BB&T. In December of 2011, the Company signed a forbearance agreement with BB&T. The Company continued to make timely payments to BB&T even as its revenue declined. Prevailing economic conditions prevented the Company from restructuring its business and becoming compliant with its Loan covenants. The

5

Company was unsuccessful in its attempts to obtain replacement refinancing.  Finally, in late June of 2013, BB&T sold its Loan to Sandton Capital Partners ("Sandton").[5]

On July 3, 2013, Sandton informed the Debtors that it wanted the Company to file a Chapter 11 bankruptcy case and sell substantially all of the Debtors' assets pursuant to 11 U.S.C. § 363.  Sandton indicated that it intended to be the entity that purchased the Debtors' assets at the bankruptcy sale.  Sandton advised that it would continue to operate the business and that it intended to keep the Debtors' management in place.  Thereafter, the Debtors agreed to work on implementing a plan that would involve the Debtors filing a Chapter 11 bankruptcy case and selling all of their assets to DSP pursuant to 11 U.S.C. § 363, so long as it was done in the best interests of the estate, and was within the fiduciary duties of the Debtors' officers and directors.

On or about July 25, 2013, the Debtors received, on behalf of DSP, a request that the Debtors execute three deeds of trust to encumber the Tower Parcels.[6]  On or about August 8, 2013, counsel for DSP provided a "Restructuring Timetable" that contained an expectation for the timely recordation of the executed deeds of trust and the commencement of the bankruptcy case in September of 2013.  Over the next several days, email correspondence concerning the "Restructuring Timetable" was exchanged between counsel for the Debtors and DSP. Communication between the parties stopped abruptly in mid-August.  Unbeknownst to the Debtors, during the several weeks of ensuing silence, DSP unilaterally filed UCC Fixture Financing Statements in Caroline County, Stafford County, and Spotsylvania County.  DSP was

---

[5]  Counsel for DSP suggested at the Hearing that DSP is an affiliated entity operated by Sandton Capital Partners and that DSP is now the holder of the Draw Commercial Note dated September 11, 2007, made by the Debtors payable to the order of BB&T in the original principal amount of $45,842,400.00.

[6]  These Deeds of Trust sought to expand the scope of the initial Security Agreement entered into between BB&T and the Debtors by granting consensual liens on the Debtors' Tower Parcels and the improvement thereon.

the first entity since the Loan's inception to attempt to perfect a security interest in the Debtors' Tower Assets.[7]

On September 24, 2013, DSP resumed negotiations by providing the Debtors with a revised Forbearance Agreement that did not require that the Debtors execute the deeds of trust. The revised Forbearance Agreement included instead a provision for a blanket release of all claims held by the Debtors against DSP. The Debtors' attempts to limit the blanket release provision to apply only to all known claims were soundly rejected by DSP. DSP explained that the new Forbearance Agreement did not include the additional mortgages and liens on the Tower Assets as DSP expected to pick up that collateral in a DIP post-petition financing order.

Ninety days after DSP had recorded its UCC Fixture Filings, DSP renewed its pressure on the Company for a speedy bankruptcy filing. The Debtors requested a meeting with DSP and its counsel at which a coordinated, global, planned approach for a bankruptcy case could be developed. On December 3, 2013, the Debtors held a phone conference with representatives of DSP. During this meeting, DSP indicated, among other things, that there was no reason to market the Debtors' assets. DSP insisted that the timeframe for conducting a bankruptcy sale of its business, with a credit bid, should be no more than six weeks from petition date to closing. DSP strongly objected to the Debtors' engagement of Protiviti as the Debtors' financial consultant. When Protiviti insisted upon distributing marketing materials in connection with the bankruptcy sales process, DSP required that the marketing materials contain on the front page, in bold font, a statement that DSP had a right to a $39 million credit bid.

---

[7] The financing statements purported to perfect a security interest in, among other things, "all machinery, equipment, fixtures, and other property of every kind and nature whatsoever owned by the Debtor . . . located upon the [Tower Parcels]."

The Debtors continued to express a willingness, consistent with their fiduciary responsibilities, to work with their secured lender in order to develop a fair process to market the Company's assets in a manner designed to maximize value for the benefit of the estate as a whole. When Protiviti developed cash flow projections for the Company, which cash flow projections indicated that the Company could survive in bankruptcy without a post-petition DIP loan facility, the relationship between the Debtors and the secured lender turned sour. Counsel for DSP challenged Protiviti's projections as too optimistic. DSP insisted that the Company had to have a new post-petition loan facility made by DSP. Otherwise, DSP would not be able to get the liens it coveted on the Tower Assets. The Debtors refused the new loan and all negotiations between the Debtors and DSP ceased at that point.

On January 11, 2014, DSP contacted counsel for the Debtors and informed them that DSP no longer supported a bankruptcy filing under the terms proposed by the Debtors. DSP advised that it would be suspending all work in connection with the bankruptcy filing. The next week, DSP recorded additional financing statements in various jurisdictions without giving any notice to the Debtors. The Debtors commenced the bankruptcy case without the support of their secured lender.

Following the Petition Date, DSP objected to the Debtors' use of cash collateral. At a contested hearing conducted on January 24, 2014, DSP asked the Court to give DSP new liens on the Tower Assets as additional adequate protection to supplement the post-petition replacement liens and adequate protection payments offered by the Debtors. DSP did not disclose to the Court or the Debtors that it had already recorded financing statements against the Tower Assets in August of 2013 and again in January of 2014. The Court denied DSP's request for the supplemental liens, finding that DSP's interest in cash collateral was adequately protected.

DSP failed to provide any witness at the Hearing to refute the Debtors' allegations that DSP's conduct was inequitable. DSP provided no evidence concerning its acquisition of the BB&T loan. In fact, there is no evidence that DSP is the holder of the Draw Commercial Note dated September 11, 2007, made by the Debtors payable to the order of BB&T in the original principal amount of $45,842,400 (the "Note"). The Court invited DSP to supplement the record with this information and with information about the amount paid for the Loan, but DSP made the calculated decision not to do so. The only witness DSP did provide at the Hearing was found to be not credible. The declaration filed by DSP in support of its Complaint was found to be both false and misleading.[8]

### Analysis

A secured creditor should be entitled to credit bid the full amount of its claim at any sale of its collateral outside the ordinary course of the debtor's business. *In re SubMicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (collecting cases and holding that the district court did not err in allowing secured creditors to credit bid the full face value of their claims when the plan administrator sought to limit the secured creditors' credit bids to the economic value of their claims). *See also Suncruz Casinos*, 298 B.R. 833, 838-39 (S.D. Fla. 2003) (stating that a secured creditor may credit bid the full amount of its claim, including any deficiency claim). The right to credit bid is codified in § 363(k) of the Bankruptcy Code which provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise, the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

---

[8] *See* Order and Memorandum Opinion on Emergency Motion for Reconsideration entered in Adversary Proceeding No. 14-03038.

11 U.S.C. § 363(k).

The right to credit bid under § 363(k) of the Bankruptcy Code is an important safeguard that insures against the undervaluation of the secured claim at an asset sale.[9] Credit bidding "allows the secured creditor to bid for its collateral using the debt it is owed to offset the purchase price[,]" which "ensures that, if the bidding at the sale is less than the amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the price to as high as the amount of its claim." *Quality Props. Asset Mgmt. Co. v. Trump Va. Acquisitions, LLC*, No. 3:11–CV–00053, 2012 WL 3542527, at *7 n.13 (W.D.V.A. Aug. 16, 2012); *RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2070 n.2 (2012) ("The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price [ ]" by enabling the secured "creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan.").

Credit bidding, however, is not an absolute right. *See In re Antaeus Tech. Servs., Inc.*, 345 B.R. 556, 565 (Bankr. W.D. Va. 2005). The Bankruptcy Court in Delaware recently admonished that while "[i]t is beyond peradventure that a secured creditor is entitled to credit bid its allowed claim . . . [t]he law is equally clear, as § 363(k) provides, that the Court may 'for cause order otherwise.'" 11 U.S.C. §363(k). *See, e.g., In re Fisker Auto. Holdings, Inc.*, Case No. 13-13087-KG, 2014 Bankr. LEXIS 230. at *15-17 (Bankr. D. Del. Jan. 17, 2014); *see also In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 315-316 (3d Cir. 2010). Generally, "a court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."

---

[9] Section 506(a) of the Bankruptcy Code limits a creditor's allowed secured claim to the value of the collateral.

*Philadelphia Newspapers,* 599 F.3d, at 316, n. 14. *See also In re Aloha Airlines Inc.,* No. 08-00337, 2009 Bankr. LEXIS 4588, 2009 WL 1371950, at *8 (Bankr. D. Hawaii May 14, 2009); *Greenblatt v. Steinberg,* 339 B.R. 458, 463 (N.D. Ill. 2006); *In re Theroux,* 169 B.R. 498, 499 n. 3 (Bankr. D.R.I. 1994) ("[T]here is no absolute entitlement to credit bid.").

The court in *In re Antaeus Tech. Servs., Inc.* denied the right of a secured creditor to credit bid in order to facilitate a fully competitive auction. *In re Antaeus,* 345 B.R. at 565. The court in *In re Fisker* found "cause" existed under § 363(k) of the Bankruptcy Code where the secured lender had chilled the bidding process by inequitably pushing the debtor into bankruptcy so that it could short-circuit the bankruptcy process. *In re Fisker* at *15-17.

The Debtors in the case at bar urge the Court to find cause exists to limit DSP's credit bid rights. The Debtors advance three reasons for doing so. First, DSP does not have a lien on all of the Company's assets. The Debtors argue that it is axiomatic that a creditor cannot credit bid the economic value of its claim against assets in which it holds no security interest. Second, the Debtors maintain that DSP has engaged in inequitable conduct that has damped interest in the auction and depressed the potential sales price the Debtors' otherwise might have realized from the sale of the the business. Finally, limiting the amount of the credit bid in this case will restore enthusiasm for the sale and foster a robust bidding process. Maximizing the value debtors might be able to realize from the sale of their assets is an important policy advanced by the Bankruptcy Code.

The Court has addressed separately the validity and extent of DSP's liens. The Court has held that DSP does not have a valid perfected security interest in all of the assets upon which it asserts it does. DSP does not have valid, properly perfected liens on, or security interests in, the Debtors' Tower Assets, the Debtors' motor vehicles, the Debtors' FCC licenses, the Debtors'

insurance policies, or the Debtors' bank account deposits. DSP's lien on general intangibles does not give it a lien on the proceeds the Debtors will generate from the bankruptcy sale. The Court has denied Plaintiff's Motion for Summary Judgment and has granted partial judgment on Defendants' Motion for Summary Judgment.[10] DSP does not have a right to assert a credit bid on assets that do not secure DSP's allowed claim.

From the moment it bought the loan from BB&T, DSP pressed the Debtor "to walk hand in hand" with it through an expedited bankruptcy sales process. It was a classic loan-to-own scenario. DSP made no secret of the fact that it acquired the Loan in order to purchase the Company. It planned from the beginning to effect a quick sale under § 363 of the Bankruptcy Code at which it would be the successful bidder for all the Debtors' assets utilizing a credit bid.

The bump in the road occurred in July of 2013, when DSP learned that it did not have a lien on the Debtors' Tower Assets. DSP made the unilateral decision to expand the scope of its security interest when DSP's overt requests for the Debtors to grant such liens on the Tower Assets failed. DSP's protestations to the contrary notwithstanding, DSP knew it did not have a valid lien on the Tower Assets when it filed the Financing Statements. The Court is troubled by DSP's recordation of the UCC Fixture Financing Statements in Stafford County, Spotsylvania County, and Caroline County in August of 2013 and again in January of 2014. The Court is disappointed that DSP neglected to disclose the Fixture Filings at the January 24, 2014, contested cash collateral hearing during which DSP requested the Court to grant it liens on those very assets.[11] DSP pressured the Debtors to shorten the Debtors' marketing period for the sale of its

---

[10] *See* Order and Memorandum Opinion of even date in Adversary Proceeding No. 14-03038.

[11] The Court is quite concerned by the false declaration DSP filed in support of Plaintiff's Motion for Summary Judgment in the Adversary Proceeding.

business and to put language in the marketing materials conspicuously advertising DSP's credit

bid rights. The Court is equally troubled by DSP's efforts to frustrate the competitive bidding

process.

The Court finds that DSP did engage in inequitable conduct. The credit bid mechanism

that normally works to protect secured lenders against the undervaluation of collateral sold at a

bankruptcy sale[12] does not always function properly when a party has bought the secured debt in

a loan-to-own strategy in order to acquire the target company. In such a situation, the secured

party may attempt to depress rather than to enhance market value. Credit bidding can be

employed to chill bidding prior to or during an auction, or to keep prospective bidders from

participating in the sales process. DSP's motivation to own the Debtors' business rather than to

have the Loan repaid has interfered with the sales process. DSP has tried to depress the sales

price of the Debtors' assets, not to maximize the value of those assets. A depressed value would

benefit only DSP, and it would do so at the expense of the estate's other creditors. The

deployment of DSP's loan-to-own strategy has depressed enthusiasm for the bankruptcy sale in

the marketplace.

The only testimony provided at the Hearing regarding the proposed bidding procedures

and auction process was from the Debtors' expert witness, Suzanne Roski ("Roski") from the

firm of Protiviti, Inc ("Protiviti").[13]   Roski presented evidence at the Hearing that many

interested parties have executed nondisclosure agreements. Many of those same parties have

visited the data room, which is populated with confidential financial information concerning the

---

[12] *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315-316 (3rd Cir. 2010).

[13] Protiviti is serving as Debtors' financial advisors in this bankruptcy case pursuant to order of this Court. Counsel for DSP acknowledged during the course of the Hearing that Protiviti is among the best firms in the restructuring world.

Debtors' business, in order to conduct preliminary inquiry in connection with the sale. To date, however, only one party has made a site visit. Numerous parties are awaiting resolution of the credit bid issue before launching advanced due diligence. There is genuine confusion among potentially interested parties over on what assets DSP has a lien and on how the auction process may unfold.

Potential bidders are now less likely to participate in the sale process. Roski testified that under the unique circumstances of this case, limiting DSP's credit bid would help restore a competitive bidding environment and engender enthusiasm for the sale. DSP chose not to present any evidence to refute or otherwise contradict this testimony. The Court can only conclude from the uncontroverted evidence presented that it is necessary to limit DSP from bidding the full amount of its claim against all of the Debtors' assets in order to foster a fair and robust sale.

At the Court's request, Roski testified as to the best procedure for fashioning a competitive auction sale and credit bid price. The Court had concerns about the sensitive nature of this testimony and about the potential for disclosure of confidential business information that might compromise the competitive nature of the auction. Accordingly, the Court ordered the courtroom to be closed to the public for this portion of Roski's testimony. The Court also ordered the transcript of the closed proceeding to be placed under seal.

The methodology Roski employed eliminated the unencumbered assets of the Debtors from the potential credit bid and applied a market analysis to develop an appropriate cap for a credit bid that would foster a competitive auction process. Roski cautioned that the methodology was not intended to present a valuation of the Company or any of its specific assets. The Court is satisfied that Roski's approach was appropriate and that her conclusions were based upon

14

credible analysis. Given the Court's finding that cause exists under the facts and circumstances presented in this case to limit the amount of DSP's credit bid, Roski's recommendations properly address the Court's concern for fostering a competitive sale while maintaining a fair credit bid amount. DSP failed to provide the Court with any alternative method for limiting the credit bid, and it declined the Courts invitation to provide evidence of the amount it paid for the Loan.

### Conclusion

The confluence of (i) DSP's less than fully-secured lien status; (ii) DSP's overly zealous loan-to-own strategy; and (iii) the negative impact DSP's misconduct has had on the auction process has created the perfect storm, requiring curtailment of DSP's credit bid rights. First, the Debtors' business operation necessarily includes unencumbered assets upon which DSP has no lien. The credit bid amount must be configured to prevent DSP from credit bidding its claim against assets such as the FCC licenses that are not within the scope of its collateral pool. Second, DSP's loan-to-own strategy has depressed enthusiasm for the sale in the marketplace. Potential bidders now perceive the sale of the business to DSP as a *fait accompli*. Those parties are not inclined to participate in an auction process. Third, limiting DSP's credit bid will attract renewed interest in the bidding process and will serve to increase the value realized for the assets.

Although DSP has engaged in inequitable conduct, the Court will not extinguish DSP's right to credit bid entirely. But sufficient cause exists for the Court to limit that credit bid amount in order to foster a robust and competitive bidding environment. Accordingly, the Court will sustain the Debtors' objection. DSP's right to credit bid under § 363(k) of the Bankruptcy Code will be limited to $1,200,000 for assets related to the Debtors' radio business on which

15

DSP has a valid, properly perfected lien and $12,700,000 for assets related to the Debtors' newspaper and printing business on which DSP has a valid, properly perfected lien.[14]

A separate order shall issue.

ENTERED:   April 14, 2014

_____/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE

ENTERED ON DOCKET
April 14, 2014

---

[14] For purposes of this decision, the Court has presumed that DSP is the holder of the Note. In order to take advantage of any credit bid, DSP must first provide proof that the Debtors and the Committee agree is sufficient, or if there is a disagreement as to the sufficiency of the proof, proof the Court concludes is sufficient, that it is indeed the lender who holds the Note that gives rise to a credit bid pursuant to 11 U.S.C. § 363(k).